Opinion issued May 11, 2017



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-16-00194-CV

———————————

### JOHN RANDOLPH JINKINS, M.D., Appellant

### V.

### JEFFREY FULLER JINKINS, MARY CELESTE JINKINS, AND WILEY JUNIOR JINKINS, III, INDIVIDUALLY AND AS TRUSTEE, Appellees

On Appeal from the Probate Court of Galveston County
Galveston County, Texas
Trial Court Case No. PR-64172-A

## O P I N I O N

This appeal involves a dispute among the four children of Wiley Junior Jinkins, Jr. ("Father") regarding ownership of mineral interests in 17 properties. One of those children, John Randolph Jinkins, M.D. ("Randy"), appeals a summary judgment declaring that the four children each own a 1/4 interest in the properties.

Randy had contended that he and Wiley Junior Jinkins, III ("Wiley"), the biological children of Father's first wife, each owned a 1/2 interest in the properties, to the exclusion of their half-siblings, Jeffrey Jinkins and Mary Jinkins.

The case turns on whether Father's interest in the properties passed into a trust that benefitted Randy and Wiley exclusively, or whether the interests either did not pass into that trust or were later removed from the trust, in which case they would pass to all four children in equal shares. Randy argues that the trial court erroneously construed the terms of the relevant wills and trust, and, for this reason, erroneously concluded that Jeffrey and Mary own an interest in the properties. Randy also contends that the trial court erred by granting summary judgment dismissing his declaratory-judgment claim and adjudicating the case solely as a trespass-to-try-title action.

Because the trial court properly concluded that Randy's claims must be brought via a trespass-to-try-title action, we affirm the trial court's summary judgment dismissing Randy's declaratory-judgment claim. But we reverse the trial court's summary judgment regarding ownership of the 17 properties in dispute and render judgment that they, having been distributed under the terms of the parents' trust, are owned in equal 1/2 shares by Randy and Wiley alone.

2

## Background

The parties agree about the series of events that led to this dispute, but they disagree about the effect of the various implicated wills and trusts. Randy argues that his parents' joint will, which was probated in 1952 after his mother's death, transferred the disputed property interests into a trust of which he and Wiley were the sole beneficiaries. The other siblings argue that the properties were not held in trust for Randy and Wiley after their mother's death but, instead, remained Father's separate property for five more decades and ultimately passed to all four children under the terms of Father's 1993 will.

### *The grandparents' joint will & trust*

The siblings' paternal grandparents, Wiley Junior Jinkins ("Grandfather") and Celeste Jinkins ("Grandmother"), originally owned the property interests in dispute. In 1942, the grandparents executed a joint will which provided that if either of them died, all of their separate and community property, other than jewelry, household goods and personal effects, would pass into a trust in which the surviving spouse would have a life estate in the revenue. Upon the surviving spouse's death, the trust corpus would pass to their only child, Father. The Grandparents' will said:

> It is our joint will and we so direct that all the rest and residue of the property, separate and community, real, personal and mixed, of whatsoever kind and wheresoever situated, which we—that is, each and both of us—may own or be entitled to receive on the day when the first of us shall die, shall pass to the Trustees hereinafter named and

3

appointed, in trust, however, for the following purposes and under the following terms and conditions:

. . . .

(b) The entire net revenue from said property and estate, after deduction of expenses incident to administration of the trust, shall be paid over periodically, at least quarterly, by our Trustee to the survivor of us during his or her lifetime, except as hereinafter provided. . . .

(c) Upon the death of the survivor of us, then our Trustee is directed to turn over and deliver to our said beloved son all of the trust property and estate and this trust shall terminate.

After Grandfather died in 1947 and the grandparents' joint will was probated, the their property, which included the mineral interests in dispute and a Galveston residence, passed into the grandparents' testamentary trust, with Grandmother having a life estate and Father having a remainder interest.

***The parents' joint will & trust***

In 1950, while Grandmother was still living, the parents of Randy and Wiley, Mother and Father, executed a joint will.  Mother died two years later, at the age of 31, and Mother and Father's joint will was probated.  Their joint will had terms similar to the grandparents' will—it provided that if either of them died, all of their separate and community property, other than jewelry, household goods, and personal effects, and expressly including any interest Father had in property in the grandparents' trust, would pass into a trust in which the surviving spouse would have a life estate in the revenue.  The will said:

4

We give, devise and bequeath all the rest and residue of the property, separate and community, real, personal and mixed, of whatsoever kind and wheresoever situated, which we, or either of us, may own or be entitled to receive on the day when the first of us shall die, and also all property subject to disposition by [Father] under the joint will of [Grandfather] and [Grandmother], shall pass to the trustee, hereinafter named and appointed, in trust, for the following purposes and under the following terms and conditions.

. . . .

(b) The entire net revenue from said property and estate after deduction of expenses incident to administration of the trust, shall be paid over periodically, at least quarterly, by our trustee to the survivor of us during his or her lifetime, except as hereinafter provided. . . .

Mother and Father's joint will expressly addressed the impact of the surviving spouse's remarriage on distributions from the trust. It provided that if the surviving spouse remarried, the trust corpus should be split in two, with the revenue from one half going to the surviving spouse during their lifetime. Specifically, it provided:

(c) If the survivor of us should marry again during the lifetime of our child or children, then our Trustee shall, at the time of such marriage, divide the trust estate hereby created, into two equal parts, paying and delivering all of the entire net revenue from one of such parts to said survivor.

The revenue from the other half of the trust was to be used for the benefit of the parents' children under age 30 until the surviving spouse died, and after the surviving spouse died, the entire trust corpus was to be divided equally between the parents' children who lived to the age of 30:

(d) Upon the marriage of said survivor, then the revenue from the other one of such parts provided in the pre-ceding sub-paragraph (c), and upon the death of the survivor, then all of the net revenue shall be used

5

by said trustee for the maintenance, education, or benefit of such of our children as shall be under the age of thirty (30) years. As each of our children becomes thirty (30) years of age, that child shall be entitled to his or her proportionate share of the corpus of the estate, it being our intention that the corpus of such trust shall be divided equally among our said children living to the age of thirty (30) years, share and share alike.

The parents' joint will also provided that it was to be probated upon the death of the first of the parents and was irrevocable unless revoked by both parents in writing:

This joint will shall be probated on the death of the first of us, and it is our special intention to make this will and contract irrevocable by either of us, save and except during the lifetime of both of us by mutual consent in writing first obtained.

Following Mother's death, Father married Priscilla Jinkins, with whom he had two children, appellees Jeffrey and Mary. In 1963, Grandmother, who had held a life estate in the revenue from the grandparents' trust, died.

*Father executes quitclaim deeds related to some of the disputed property interests*

Two years before Grandmother died, she and Father, in his individual capacity and as co-trustee for the grandparents' trust, executed an oil and gas lease pertaining to some of the disputed property interests.

Ten years after Grandmother's death, Father transferred the Galveston residence out of the parents' trust. To do so, he executed two quitclaim deeds. He executed one deed as co-trustee of the portion of the parents' trust that was for his benefit as the life tenant:

6

> That we, [Father], and United States National Bank of Galveston, Co-Trustees of a Testamentary Trust established under the Last Will and Testament of [Mother], Deceased, for the benefit of her surviving spouse, [Father], (hereinafter referred to as "Grantors"), of the County of Galveston, and the State of Texas, for an in consideration of the sum of Ten Dollars ($10.00), to me in hand paid by [Father], (hereinafter referred to as "Grantee") . . . do by these presents, bargain, sell release and forever quitclaim unto said Grantee, his heirs and assigns, all my right title and interest in and to [the Galveston residence.]

Father executed the second deed as co-trustee of the portion of the parents' trust that was for the benefit of Randy and Wiley:

> That we, [Father], and United States National Bank of Galveston, Co-Trustees of a Testamentary Trust established under the Last Will and Testament of [Mother], Deceased, for the benefit of her children, Wiley . . . and [Randy], (hereinafter referred to as "Grantors"), of the County of Galveston, and the State of Texas, for an in consideration of the sum of Ten Dollars ($10.00), to me in hand paid by [Father], (hereinafter referred to as "Grantee") . . . do by these presents, bargain, sell release and forever quitclaim unto said Grantee, his heirs and assigns, all my right title and interest in and to [the Galveston residence.]

On appeal, Randy concedes that these deeds removed the Galveston residence from the parents' trust and made the residence Father's separate property, which passed to the four children equally at Father's death.

Ten days later, Father executed quitclaim deeds on a number of the properties in dispute. Father executed these deeds as co-trustee for the portion of the parents' trust that was for his benefit as a life tenant. Unlike the Galveston residence, Father did not execute companion quitclaim deeds as co-trustee for the portion of the parents' trust that was for the benefit of Randy and Wiley.

7

More than 10 years after Grandmother died, Father, individually, executed another oil and gas lease on some of the properties in dispute. These leases, unlike the 1961 lease, however, characterized the interests being leased as Father's "sole and separate property."

### Father's 1993 will

In 1993, Father executed an individual will which revoked any prior wills. The 1993 will created a marital trust for Priscilla and a residuary trust that paid income to her for her lifetime, with the corpus to be distributed to the four children equally upon her death.[1] The residuary trust included:

> all property of whatever nature and wherever situated in which I may have any interest (including lapsed gifts) which is not disposed of other than by the Section entitled "Residuary Estate."

The parties agree that the 1993 will does not expressly mention the disputed property interests.

Father died in 2000, and his 1993 will was probated in 2001. The parties agree that no one disputed the probate of the 1993 will and that the disputed property interests were not included in the estate's inventory

---

[1] In the case of Jeffrey and Mary, the distributions were to be made to a trust created for each of them. Wiley was designated the trustee for these trusts.

8

*The genesis of this dispute*

In 2011, Randy executed several mineral leases with Istrouma Resources, Inc. covering nine of the now-disputed properties. Istrouma assigned the leases to EOG Resources, Inc., which notified Randy in November 2013 that it had concluded that all four siblings may own a 1/4 interest in the leased interests. Randy took the position that he and Wiley each owned 1/2 interests in the leased tracts, which is how the interests had been treated until EOG's 2013 letter, and that Jeffrey and Mary did not own any part of the leased properties.

Randy sued Jeffrey, Mary, and Wiley in his individual capacity and as trustee for Jeffrey and Mary's trusts, seeking a declaratory judgment that he and Wiley each owned 1/2 interests in all 17 of the properties in dispute, to the exclusion of Jeffrey and Mary. Jeffrey, Mary, and Wiley first sought a partial summary judgment that Randy's claims were required to be brought via a trespass-to-try-title action because they concerned title to property, which the trial court granted. Randy then repleaded his claims as trespass-to-try-title actions, and the parties filed cross-motions for summary judgment.

In his summary-judgment motion, Randy argued that the disputed property interests passed to him and Wiley under the terms of the parents' trust created in 1952, and they were not distributed to the four siblings as Father's separate property under the terms of Father's 1993 will. In their summary-judgment motion, appellees

9

argued that the property interests had not passed into the parents' trust, or, if they did, that Father transferred all of the disputed property interests out of the parents' trust so that they became his separate property and passed to all four children equally under the terms of Father's 1993 will. Alternatively, they argued that the pretermitted child statute operates to grant each of Jeffrey and Mary a proportionate share of the disputed property interests.

The trial court denied Randy's summary-judgment motion and granted that of appellees, concluding that each of Father's four children owns a 1/4 share in the disputed properties.

## Will Construction

The dispute in this case is, essentially, whether the disputed property interests were held in trust for Randy and Wiley under the terms of the parents' trust or instead remained outside the parents' trust and passed to all four of Father's children under the terms of Father's 1993 will. In his first four issues, Randy argues that the trial court erred by granting summary judgment in favor of his siblings on the property ownership question because the disputed property interests passed into the trust created by Mother and Father's joint will, and remained in that trust for the benefit of Randy and Wiley only.

Appellees, on the other hand, argue that the trial court properly held that each of Father's four children owned 1/4 of the disputed property interests because they

were distributed under the terms of Father's 1993 will. They offer five alternative theories as to how Jeffrey and Mary acquired an interest in the disputed properties:

- the disputed property interests never passed into the parents' trust, which included only Mother's property;

- even if the parents' trust included all of Father's separate and community property accumulated before the creation of the trust in 1952, Father's remainder interest in the disputed property interests did not vest until after Grandmother's death in 1963, and he therefore had no interest in the disputed properties to transfer at the time the parents' trust was created;

- Father's 1993 will revoked the parents' trust;

- Father transferred all of the disputed property interests out of the parents' trust to himself as his separate property so that the interests would pass to the four children equally under Father's 1993 will; or

- the pretermitted child statute applies here and distributes the property interests to the four children in equal shares.

Appellees also contend that Randy's trespass-to-try-title claims are barred by the two-year statute of limitations applicable to will contests.

## A. Standard of Review

We review a trial court's summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

11

In a traditional summary-judgment motion, the movant has the burden to show that no genuine issue of material fact exists and that the trial court should grant judgment as a matter of law. TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999).  A party moving for summary judgment on one of its own claims must conclusively prove all essential elements of the claim. *See Rhône–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999).  A defendant may also prevail by traditional summary judgment if it conclusively negates at least one essential element of a plaintiff's claim or conclusively proves an affirmative defense. *See IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004).  A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005).

When, as here, the parties file cross-motions for summary judgment on overlapping issues, and the trial court grants one motion and denies the other, we review the summary-judgment evidence supporting both motions and "render the judgment that the trial court should have rendered." *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000).

**B.      Applicable Law**

Construction of an unambiguous will is a matter of law that we review de novo. *See San Antonio Area Found. v. Lang*, 35 S.W.3d 636, 639 (Tex. 2000); *Coleman v. Coleman*, 350 S.W.3d 201, 203 (Tex. App.—San Antonio 2011, no pet.). In construing a will, the court's focus is on the testatrix's intent. *Lang*, 35 S.W.3d at 639 (citing *Huffman v. Huffman*, 339 S.W.2d 885, 888 (Tex. 1960). This intent must be ascertained from the language found within the four corners of the will. *Id.* (citing *Shriner's Hosp. for Crippled Children of Tex. v. Stahl*, 610 S.W.2d 147, 151 (Tex. 1980)). The court should focus not on "what the testatrix intended to write, but the meaning of the words she actually used." *Id.* (quoting *Stahl*, 610 S.W.2d at 151). In this light, courts must not redraft wills to vary or add provisions "under the guise of construction of the language of the will" to reach a presumed intent. *Id.* (quoting *Stahl*, 610 S.W.2d at 151).

Determining a testatrix's intent from the four corners of a will requires a careful examination of the words used. *Id.* If the will is unambiguous, a court should not go beyond specific terms in search of the testatrix's intent. *Id.* (citing *Frost Nat'l Bank v. Newton*, 554 S.W.2d 149, 154 (Tex. 1977)). The Texas Supreme Court "has long held that when there is no dispute about the meaning of words used in a will, extrinsic evidence will not be received to show that the testatrix intended something outside of the words used." *Id.*

"Typically, a remainder interest occurs when a possessory interest in property (often a life estate) is given to one person, with a subsequent taking of the estate in another person." *In re Townley Bypass Unified Credit Tr.*, 252 S.W.3d 715, 717 (Tex. App.—Texarkana 2008, pet. denied). "If a remainder interest is in an ascertainable person, and no condition precedent exists other than the termination of prior estates, then it is a vested remainder." *Id.* "Texas courts will not construe a remainder as contingent when it can reasonably be taken as vested." *McGill v. Johnson*, 799 S.W.2d 673, 675 (Tex. 1990). "[A] remainder is vested when there is a person in being at the creation of the interest who would have a right to immediate possession upon termination of the intermediate estate." *Townley*, 252 S.W.3d at 717 (citing *Chadwick v. Bristow*, 208 S.W.2d 888, 891 (Tex. 1948)). A vested remainder may be transferred. *See id.* at 718.

## C. Analysis

### 1. Was Father's remainder interest in the disputed properties held in the grandparents' trust capable of being transferred by the parents' joint will into the parents' trust before Grandmother, the life tenant of the grandparents' trust, died?

The first question we are called to answer is whether Father's remainder interest in the disputed property interests held in the grandparents' trust was a vested remainder that was capable of being transferred by the parents' joint will into the parents' trust before Grandmother, the life tenant of the grandparents' trust, died. Under the terms of the grandparents' trust, Grandmother held a life estate in the

14

revenue from the grandparents' trust, and Father was entitled to receive the trust corpus when Grandmother died:

> Upon the death of the survivor of us, then our Trustee is directed to turn over and deliver to our said beloved son all of the trust property and estate and this trust shall terminate.

Appellees argue that Father's remainder interest in the trust property was not transferrable until the property was distributed to him, and therefore could not have passed into the parents' trust during Grandmother's lifetime. Randy argues that Father had a vested remainder in the disputed properties from the time that the grandparents' trust was created in 1947, and therefore Father's vested remainder interest could be transferred into the parents' trust when the trust was created pursuant to the terms of the parents' joint will after Mother's death in 1952.

It is undisputed that Father had a remainder interest in the disputed properties, and the sole question is whether the remainder was vested and capable of being transferred. *See Townley*, 252 S.W.3d at 717 (remainder interest occurs when possessory interest in property like a life estate is given to one person, with a subsequent taking of estate in another person). We conclude that it was. The parties agree that the remainder interest under the grandparents' trust was in an "ascertainable person"—Father. *See id.* If a remainder interest is in an ascertainable person, and no condition precedent exists other than the termination of prior estates, then it is a vested remainder. *See id.* Father was entitled to receive all of the property

15

in the grandparents' trust when Grandmother's life estate terminated upon her death. Thus, the only condition precedent to Father's taking the property was the termination of Grandmother's prior life estate. Accordingly, Father's interest in the properties was a vested remainder. *See id.* at 717–18. Because Father's interest in the properties was a vested remainder, it was transferrable. *See McGill*, 799 S.W.2d at 675; *Townley*, 252 S.W.3d at 717–18.

**2.  Did Father's vested remainder interest in the disputed properties pass into the parents' trust when the parents' joint will was probated in 1952?**

We next consider whether Father's interest in the disputed properties passed into the parents' trust when the parents' joint will was probated in 1952. Appellees argue that under the terms of the will, only Mother's property passed into the trust. Randy argues that under the terms of the will, both Mother and Father's property, including Father's vested remainder interest in the disputed properties, passed into the trust.

The plain language of the parents' joint will provides that all of Mother's and Father's property, including any devisable interest Father had in the property in the grandparents' trust, would pass into the parents' trust upon the death of the first of them. Specifically, the parents' joint will provided:

> We give, devise and bequeath all the rest and residue of the property, separate and community, real, personal and mixed, of whatsoever kind and wheresoever situated, which we, or either of us, may own or be entitled to receive on the day when the first of us shall die, and also all

16

> property subject to disposition by [Father] under the joint will of [Grandfather] and [Grandmother], shall pass to the trustee, hereinafter named and appointed, in trust, for the following purposes and under the following terms and conditions.

Thus, the parents' joint will provided that when Mother or Father died, both parents' property would pass into the parents' trust.

We have already concluded that Father's interest in the disputed properties held in the grandparents' trust was a vested remainder capable of being transferred. And the parents' joint will expressly provided that these properties would pass into the parents' trust upon the death of either of them. It also expressly stated that all property subject to disposition by Father under the grandparents' will would pass into the parents' trust *for the benefit of Randy and Wiley* when the first of the parents died. The disputed property interests were property Father was "entitled to receive" under the terms of the grandparents' will and they are also property "subject to disposition" by Father. Thus, under the plain terms of the parents' joint will, Father's vested remainder interest in the disputed property interests passed into the parents' trust when the parents' joint will was probated after Mother's death in 1952.

Accordingly, we hold that Mother's and Father's property, including Father's vested remainder interest in the disputed properties, passed into the parents' trust when the parents' joint will was probated in 1952.

**3.** **Father's 1993 will did not revoke the parents' trust.**

We next consider whether the parents' trust was revoked by Father's 1993 will. Appellees argue that Father's 1993 will expressly revoked any previous wills and therefore, even if the disputed properties passed into the parents' trust pursuant to the terms of the parents' joint will, the trust was effectively revoked when the 1993 will was probated. We conclude that the 1993 will did not revoke the parents' trust.

The parents' joint will provided that it was irrevocable unless revoked in writing by both parents:

> This joint will shall be probated on the death of the first of us, and it is our special intention to make this will and contract irrevocable by either of us, save and except during the lifetime of both of us by mutual consent in writing first obtained.

While Father's 1993 purported to revoke the parents' previous joint will, it did not purport to revoke the parents' trust. The 1993 will did not mention the parents' trust at all.

While a will is generally revocable at any time before the testator's death, the law governing the revocation of a trust is different. A settlor may revoke a trust unless it is irrevocable by the express terms of the instrument creating it or of an instrument modifying it. TEX. PROP. CODE § 112.051. "No specific words of art are needed to create an irrevocable trust." *Vela v. GRC Land Holdings, Ltd.*, 383 S.W.3d 248, 250 (Tex. App.—San Antonio 2012, no pet.). However, the instrument must

18

clearly reflect the settlors' intent to make the trust irrevocable. *Id.*; *see McCauley v. Simmer*, 336 S.W.2d 872, 881 (Tex. Civ. App.—Houston 1960, writ dism'd). If a trust is revocable but provides specific terms for how it may be revoked, the trust may not be modified unless those terms are complied with. *McClure v. JPMorgan Chase Bank*, 147 S.W.3d 648, 653 (Tex. App.—Fort Worth 2004, pet. denied) (if settlor of trust reserves power to modify trust only in specific manner, trust may only be modified in that manner) (quoting *Runyan v. Mullins*, 864 S.W.2d 785, 790 (Tex. App.—Fort Worth 1993, writ denied). If a trust is revocable and does not contain terms governing its modification or revocation, the settlor may revoke it without complying with a specific procedure, but must manifest a clear intent to revoke the trust in order for it to be revoked. *See Appling v. Jay*, 390 S.W.2d 799, 802 (Tex. Civ. App.—Texarkana 1965, writ ref'd n.r.e.) (in order to revoke trust, settlor must manifest an intent to revoke trust); *cf. Sanderson v. Aubrey*, 472 S.W.2d 286, 288 (Tex. Civ. App.—Fort Worth 1971, writ ref'd n.r.e.) (statement in will expressly providing that trust was revoked was sufficient to revoke trust).

Here, the parents' joint will, which was the instrument creating the parents' trust, provided that the joint will could be revoked only "during the lifetime of both of us by mutual consent in writing first obtained." It is undisputed that the joint will was not revoked by the parents' mutual written consent. *See McClure*, 147 S.W.3d at 653. But more importantly, although Father executed a new will purporting to

19

revoke his previous joint will, his new will did not mention the parents' trust nor attempt to revoke it. Thus, aside from the question of whether Father was even capable of revoking the parents' trust (as opposed to the parents' will), he did not manifest a clear intent to revoke the trust. *See Sanderson*, 472 S.W.2d at 288; *Appling*, 390 S.W.2d at 802. Accordingly, we conclude that Father's 1993 will did not revoke the parents' trust. *See Appling*, 390 S.W.2d at 802; *cf. Sanderson*, 472 S.W.2d at 288.

**4. Were any of the disputed property interests transferred out of the parents' trust to Father as his separate property such that they passed under the terms of his 1993 will?**

Having concluded that the disputed property interests passed into the parents' trust and that the parents' trust was not revoked, we now consider whether Father transferred any of the disputed properties out of the parents' trust to himself, for his benefit, such that they became his separate property that would pass under the terms of the 1993 will, to the four children equally. We conclude there is no evidence that Father transferred any of the disputed properties out of the parents' trust such that they became Father's separate property.

Although Father executed quitclaim deeds related to some of the disputed mineral interests as co-trustee for the portion of the parents' trust that was for his benefit, these deeds alone did not convert these interests into Father's separate property. Under the terms of the trust, Father possessed only a life estate in half of

the revenue from the trust; the underlying properties themselves were held in trust for the benefit of Randy and Wiley, to be divided equally between Randy and Wiley when Father died. Although Father had the power as co-trustee of the trust for the boys to transfer property in which Randy and Wiley had an interest, unlike with the Galveston residence, Father did not execute quitclaim deeds in his capacity as co-trustee for the portion of the parents' trust that was for the boys' benefit for *any* of the disputed mineral interests. The quitclaim deeds that Father did execute, solely in his capacity as co-trustee for the portion of the trust that was for his benefit, transferred only Father's interest in his own life estate in the *revenue* of the trust assets; they did not transfer the interests in the properties themselves to Father, and the disputed mineral interests therefore did not become Father's separate property. *See Black v. Washington Mut. Bank*, 318 S.W.3d 414, 418 (Tex. App.—Houston [1st Dist.] 2010, pet. dism'd w.o.j.) (quitclaim deed only transfers grantor's right in property, if any, without warranting or professing that title is valid).

Appellees argue that the oil and gas lease Father executed in 1976, which stated that some of the subject property interests were his "sole and separate property," conclusively proves these interests were Father's separate property and passed to all four children under the terms of Father's 1993 will. But execution of the 1976 lease could not make these properties Father's separate property. While this is some evidence Father represented that certain of the disputed property

21

interests were his separate property, this evidence supports an equally probable inference, which is that Father was mistaken about the nature of these property interests. In the absence of other evidence showing that these property interests were removed from the trust, evidence that raises more than one equally probable inference does not raise a fact issue to defeat summary judgment. *See City of Keller*, 168 S.W.3d at 813 (when evidence is equally consistent with either of two facts, neither fact may be inferred); *see, e.g.*, *Aranda v. Willie Ltd. P'ship*, No. 03-15-00670-CV, 2016 WL 3136884, at *2 (Tex. App.—Austin June 1, 2016, no pet.) (mem. op.) (because summary-judgment evidence raised equally plausible inferences, it did not raise a fact issue and summary-judgment was properly granted; collecting cases).

In short, there is no evidence that the corpus of the disputed property interests was transferred out of the parents' trust to Father or otherwise became his separate property. Only Father's property interests acquired after the creation of the parents' trust passed under the terms of his 1993 will. Because they were placed in the testamentary trust upon Mother's death, when Father died in 2000, the disputed property interests passed under the terms of the parents' trust to Randy and Wiley equally, to the exclusion of Jeffrey and Mary.[2] *See, e.g.*, *Sorrel v. Sorrel*, 1 S.W.3d 867, 871 (Tex. App.—Corpus Christi 1999, no pet.) (when trust terminates, legal

---

[2] The parties agree that Randy and Wiley reached the age of 30 during the 1970s.

22

title to all trust property vests in beneficiaries without necessity of transfer or conveyance to them of title by any person, trustee, executor, or otherwise) (citing *Gonzalez v. Gonzalez*, 469 S.W.2d 624, 631 (Tex. Civ. App.—Corpus Christi 1971, writ ref'd n.r.e.)). We therefore hold that the trial court erred by rendering judgment that each of Father's four children owns a 1/4 interest in the disputed property interests, because the evidence conclusively shows that these property interests were subject to and distributed under the terms of the parents' trust, and not Father's 1993 will. We hold that under the terms of the parents' trust, the trust corpus was distributed equally between Randy and Wiley when Father died and Father's life estate in the parents' trust terminated.

### 5. The pretermitted child statute does not change this result.

Appellees argue that even if the disputed property interests passed into the parents' trust for Randy and Wiley's benefit, the trial court's judgment is correct because the pretermitted child statute operates to include Jeffrey and Mary. A "pretermitted child" means a testator's child who is born or adopted: (1) during the testator's lifetime or after the testator's death; and (2) after the execution of the testator's will. TEX. EST. CODE § 255.051. If a pretermitted child is not mentioned in or provided for in a testator's will or otherwise provided for by the testator, then the pretermitted child succeeds to a portion of the testator's estate under section

23

255.053 or 255.054 of the Estates Code. TEX. EST. CODE §§ 255.052, 255.053, 255.054.

But the statute does not apply here. It is undisputed that Jeffrey and Mary were provided for in the will that was probated at Father's death: the 1993 will. Accordingly, they do not fit the definition of a pretermitted child. *See* TEX. EST. CODE § 255.051; *Ozuna v. Wells Fargo Bank, N.A.*, 123 S.W.3d 429, 430 (Tex. App.—San Antonio 2003, no pet.) (because probated will provided for child, child was not pretermitted child under plain terms of pretermitted child statute).

**6. Randy's claims are not barred by the two-year statute of limitations applicable to will contests.**

Appellees contend that Randy's claims are barred by the two-year statute of limitations applicable to will contests. *See* TEX. EST. CODE § 256.204 (statute of limitations for interested person to contest will is two years from date that will is admitted to probate). Appellees argue Randy should have known that he had a claim that the trust property was improperly distributed when Father's 1993 will was admitted to probate in 2001, and therefore the period in which to bring his claims expired in 2003, 11 years before he sued. Randy argues that his suit is not barred because the 1993 will did not purport to revoke the parents' trust or distribute any of the trust property, Father's estate inventory did not include any of the trust properties, he and Wiley were each paid half of the royalties from the disputed mineral interests until EOG's November 2013 letter, and he sued in September 2014,

24

less than one year after first learning that there was any question about who owned the disputed property interests.

A party moving for summary judgment on the basis of limitations must conclusively establish the bar of limitations, *Zale Corp. v. Rosenbaum*, 520 S.W.2d 889, 891 (Tex. 1975), and to defeat a motion for summary judgment on the grounds that the claims are barred by limitations, the nonmovant must adduce evidence that raises a fact issue regarding the applicability of limitations. *See Vale v. Ryan*, 809 S.W.2d 324, 326 (Tex. App.—Austin 1991, no writ). The statute of limitations begins to run when a cause of action accrues. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003). Ordinarily, unless the discovery rule applies, a cause of action accrues when a wrongful act causes a legal injury, regardless of when the plaintiff learns of that injury or if all resulting damages have yet to occur. *See id.* (citing *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996)); *Baxter v. Gardere Wynne Sewell LLP*, 182 S.W.3d 460, 462 (Tex. App.—Dallas 2006, pet. denied).

Here, appellees' sole basis for claiming that Randy's claims are time-barred is the fact that Father's 1993 will was probated in 2001. But appellees adduced no evidence that any of the trust property was distributed to the four children by the 1993 will so as to cause Randy's claims to accrue and trigger any statute of limitations. To the contrary, it is undisputed that the disputed property interests were

25

treated as Randy and Wiley's property alone, consistent with the terms of the parents' trust, from the time of Father's death until EOG's 2013 letter. In short, the mere fact that the 1993 will was probated in 2001 does not raise a fact issue about the applicability of limitations, much less conclusively establish that Randy's claims accrued at that time. *See Knott*, 128 S.W.3d at 221; *Zale Corp.*, 520 S.W.2d at 891; *Vale*, 809 S.W.2d at 326. Accordingly, we hold that appellees failed to conclusively establish their limitations defense or raise a fact issue about the applicability of limitations. *See Knott*, 128 S.W.3d at 221; *Zale Corp.*, 520 S.W.2d at 891; *Vale*, 809 S.W.2d at 326.

We sustain Randy's first, second, third, and fourth issues.

## Declaratory Judgment Claim

In his fifth issue, Randy argues that the trial court erred by granting summary judgment dismissing his declaratory judgment claim and related claim for attorney's fees.

### A.     Applicable Law

Certain types of property disputes must be brought as trespass-to-try-title actions. *See Martin v. Amerman*, 133 S.W.3d 262, 264–65, 267 (Tex. 2004) (When "the trespass-to-try-title statute governs the parties' substantive claims . . ., [the plaintiff] may not proceed alternatively under the Declaratory Judgments Act to recover their attorney's fees."), *superseded on other grounds by statute*, TEX. CIV.

PRAC. & REM. CODE § 37.004(a); *I-10 Colony, Inc. v. Lee*, 393 S.W.3d 467, 474–75 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). However, "[t]he line segregating claims impacting title to property that *can* be brought as declaratory judgment actions from those claims impacting title that *must* be brought as trespass-to-try-title actions is not a clear one under current Texas law." *I-10 Colony*, 393 S.W.3d at 474. "The uncertainty originates with two legislative directives that appear to overlap to some degree." *Id.* "Section 22.001(a) of the Property Code mandates that '[a] trespass to try title action is the method of determining title to lands, tenements, or other real property.'" *Id.* (quoting TEX. PROP. CODE § 22.001(a)). The Uniform Declaratory Judgments Act ("DJA"), however, provides that "[a] person interested under a deed, will, written contract, or other writings . . . may have determined any question of construction or validity arising under the instrument . . . and obtain a declaration of rights, status, or other legal relations thereunder." TEX. CIV. PRAC. & REM. CODE § 37.004(a)). These statutes differ in their pleading and proof requirements, and only the DJA allows a successful party to recover attorney's fees. *See Martin*, 133 S.W.3d at 267.

"Disputes based on claims of superior title are trespass to try title actions." *Mid Pac Portfolio, LLC v. Welch*, No. 01-15-00404-CR, 2016 WL 828150, at *4 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (mem. op.). If a dispute involves a claim of superior title and the determination of possessory interests in property, it

27

must be brought as a trespass-to-try-title action. *See Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 926 (Tex. 2013). "[A] litigant's couching its requested relief in terms of declaratory relief does not alter the underlying nature of the suit." *Tex. Parks & Wildlife Dept. v. Sawyer Trust*, 354 S.W.3d 384, 388 (Tex. 2011).

## B.    Analysis

It is undisputed that Randy sought an adjudication regarding ownership of the disputed property interests. He concedes that "the ultimate determination in this action touches on ownership of mineral interests and real property," but argues that title ownership is "only incidental" to this dispute. He contends that he was not required to bring his claims as trespass-to-try-title actions because the DJA expressly provides for the adjudication of rights under a "deed, will, written contract, or other writings . . . . ." TEX. CIV. PRAC. & REM. CODE § 37.004(a). He argues that forcing his claim to be tried as trespass-to-try-title actions as opposed to a declaratory judgment action frustrates this language in the DJA.

Randy relies upon *Florey v. Estate of McConnell*, 212 S.W.3d 439 (Tex. App.—Austin 2006, pet. denied), to support his argument that his claim may be brought under the DJA. But in *Florey*, as Randy acknowledges, the court concluded that declaratory-judgment relief was proper because the plaintiff was not seeking title to the property. Here, in contrast, Randy is seeking title to the properties.

28

Because Randy sought title to and possession of the disputed property interests, his claims fell within the category of claims required to be brought as trespass-to-try-title actions. *See Coinmach*, 417 S.W.3d at 926; *Martin*, 133 S.W.3d at 267; *I-10 Colony*, 393 S.W.3d at 474–75. Although resolution of these claims required construction of wills, the fact that the DJA might otherwise cover his claims does not mean his claim may be brought under the DJA if it must be brought as a trespass-to-try-title action. *See Martin*, 133 S.W.3d at 267 (When "the trespass-to-try-title statute governs the parties' substantive claims . . ., [the plaintiff] may not proceed alternatively under the Declaratory Judgments Act to recover their attorney's fees."). Accordingly, we hold that the trial court did not err by granting summary judgment dismissing Randy's declaratory judgment claim and related claim for attorney's fees. *See Coinmach*, 417 S.W.3d at 926; *Martin*, 133 S.W.3d at 267; *I-10 Colony*, 393 S.W.3d at 474–75.

**Conclusion**

We affirm the trial court's summary judgment as to whether Randy could seek relief via a declaratory-judgment action, and, because Randy concedes it is correct, we also affirm the trial court's summary judgment as to ownership of the Galveston residence. We reverse the trial court's summary judgment regarding ownership of the interests in real property identified in Exhibits 1 through 17 of the trial court's final judgment, render judgment denying appellees' summary-judgment motion

regarding ownership of these properties, and render judgment in favor of Randy on his trespass-to-try title claims that that those interests are owned as follows: 1/2 by John Randolph Jinkins, M.D. and 1/2 by Wiley Junior Jinkins, III.

Rebeca Huddle
Justice

Panel consists of Justices Keyes, Bland, and Huddle.