**Opinion issued August 26, 2021**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-19-00580-CV**

———————————

**THOMAS GUNNAR KELLY, Appellant**

**V.**

**SHERRY MARIE KELLY, Appellee**

---

**On Appeal from the 246th District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-21540**

---

## O P I N I O N

In this divorce case, the trial court dissolved the marriage between appellant,

Thomas (Tom) Gunnar Kelly, and appellee, Sherry Marie Kelly. In the divorce

decree, the trial court awarded a disproportionate share of the community estate to

Sherry, awarded spousal maintenance to Sherry, and ordered Tom to pay Sherry's outstanding attorney's fees.

On appeal, Tom raises several issues primarily relating to characterization of the parties' assets and division of the marital estate. He argues that the trial court erred by characterizing 100% of his 401(k) account, severance payments, and an investment account as part of the community estate and awarding portions to Sherry. He also argues that the trial court erred by characterizing a car as a gift from Tom to Sherry, making that car her separate property as opposed to community property. He further argues that the trial court erred by awarding spousal maintenance to Sherry because the property awarded to her in the decree can provide for her minimum reasonable needs, and because Sherry presented legally insufficient evidence of a disability justifying maintenance.

In several related sub-issues, Tom argues that the trial court erred by finding that he committed fraud and finding that he concealed the existence of a trust, which he claims does not exist. He also argues that the trial court erred by admitting certain documents, making math errors in the decree and property division, and awarding a disproportionate amount of the marital estate to Sherry. Finally, he argues that Sherry did not present legally sufficient evidence that her attorney's fees were reasonable and necessary.

We affirm in part and reverse and remand in part.

**Background**

Tom and Sherry married on November 6, 2012. Tom has two adult daughters from a previous marriage, and Sherry has one adult son from a previous marriage. Tom and Sherry do not have children together. Sherry filed a petition for divorce in March 2018, alleging insupportability and cruelty as grounds for divorce. She requested that the trial court award her spousal maintenance following divorce. Tom filed a counterpetition for divorce in August 2018, alleging insupportability and adultery as grounds for divorce. Both parties requested a disproportionate share of the community estate and asserted reimbursement claims for expenditure of community funds to benefit the other spouse's separate estate. Tom also asserted a reimbursement claim for the expenditure of his separate funds for the benefit of the community estate.

The trial court held a bench trial in May 2019. At trial, the parties testified concerning the circumstances surrounding their marriage and separation. The parties also testified concerning their relative financial positions; Tom's employment at AIG and, later, Bank of America; Sherry's medical history and her disability status; both parties' expenditures during the pendency of the divorce; Tom's potential inheritance; and the characterization of several disputed assets, including Tom's AIG 401(k) account, Tom's severance payments from AIG, bank and investment accounts, and a car. Tom's 401(k) was worth $468,344.55 at the time of trial. The

3

parties also disputed whether Tom was the beneficiary of a currently existing family trust or a testamentary trust that would be created upon the death of his parents. With respect to Tom's AIG pension plan, the parties stipulated that 59% was Tom's separate property and 41% was community property.

At the close of trial, the trial court announced its intention to make a disproportionate division of the community estate in favor of Sherry. The trial court also stated that Tom had attempted to defraud the court "in not disclosing property" and had been dishonest with the court "in submitting the documents that he wants to but making a legal decision for himself that certain things are not subject to production because they are not properly before the Court."

In the final divorce decree, the trial court dissolved the marriage on the grounds of cruelty. The property that the trial court awarded to Sherry included approximately $6,000 worth of furniture, furnishings, clothing, and personal effects in Sherry's possession; 100% of cash, assets, and securities in an E*Trade investment account in Tom's name, worth approximately $172,391.01; $40,549.77 in a Bank of America checking account in Tom's name; 78.65% of Tom's AIG 401(k), worth approximately $368,344.55; 100% of the community property portion of Tom's AIG pension plan; 100% of the assets in an E*Trade IRA Rollover account in Tom's name, worth approximately $41,189.99; 100% of the points, miles, and rewards in a United Airlines account in Tom's name; and 60% "of any interest,

4

whether such interest is in the corpus or income, of any trust in which [Tom] has an interest." The trial court also awarded Sherry a 2014 Ford Mustang, in Tom's name, as her separate property.

The property the trial court awarded to Tom included approximately $30,000 worth of furniture, furnishings, clothing, and personal effects in his possession; 100% of unpaid severance checks from AIG; 100% of AIG units of stock in a UBS account, worth approximately $82,000; 21.35% of the AIG 401(k), worth approximately $100,000; 40% "of any trust in which [Tom] has an interest"; 100% of the reconstituted value of the community estate, worth $39,449.31, which includes five unaccounted-for AIG severance checks, unaccounted-for unemployment benefits, and at least $15,000 in undisclosed cash Tom deposited in a bank account in his brother's name; and the remaining funds in a Bank of America checking account. The trial court awarded to Tom, as his separate property, a house in Katy and 59% of the AIG pension plan.

The trial court also found that Sherry incurred $72,573.60 in reasonable and necessary attorney's fees during the pendency of the divorce, $41,135.97 of which was still outstanding. The trial court ordered Tom to pay Sherry's outstanding trial-level attorney's fees and $15,000 in conditional appellate-level attorney's fees.

Finally, the trial court awarded spousal maintenance to Sherry. The court ordered Tom to pay $1,952 per month to Sherry for a total of twenty-five months.

5

The trial court filed findings of fact and conclusions of law. This appeal followed.

**Standard of Review**

In family law cases in which the appellate standard of review is abuse of discretion, legal and factual sufficiency of the evidence are not independent grounds for asserting error, but are instead relevant factors in assessing whether the trial court abused its discretion. *Syed v. Masihuddin*, 521 S.W.3d 840, 847 (Tex. App.— Houston [1st Dist.] 2017, no pet.). In determining whether an abuse of discretion exists because the evidence is legally or factually insufficient to support the trial court's decision, we consider whether the trial court had sufficient information upon which to exercise its discretion and whether it erred in its application of that discretion. *Id.*

When conducting a legal sufficiency review, we review the evidence in a light favorable to the finding, crediting favorable evidence if a reasonable factfinder could do so and disregarding contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Syed*, 521 S.W.3d at 847 n.4. If the evidence would enable reasonable and fair-minded people to differ in their conclusions, then the factfinder must be allowed to decide. *Syed*, 521 S.W.3d at 847 n.4; *see City of Keller*, 168 S.W.3d at 827 ("The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded

people to reach the verdict under review."). As long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the factfinder. *Syed*, 521 S.W.3d at 847 n.4.

The standard of review of a sufficiency of evidence issue is heightened when the burden of proof at trial is clear and convincing evidence. *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002); *Watson v. Watson*, 286 S.W.3d 519, 523 (Tex. App.—Fort Worth 2009, no pet.). A spouse seeking to establish the separate character of property must prove the property's character by clear and convincing evidence. TEX. FAM. CODE § 3.003(b); *Watson*, 286 S.W.3d at 523. "Clear and convincing evidence" is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *Watson*, 286 S.W.3d at 523; *see* TEX. FAM. CODE § 101.007.

In a legal sufficiency review of a finding concerning the separate character of property, we review all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. *Watson*, 286 S.W.3d at 523; *see Boyd v. Boyd*, 131 S.W.3d 605, 611 (Tex. App.—Fort Worth 2004, no pet.) ("While the proof must weigh heavier than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed."). In reviewing the evidence for factual sufficiency, we must give due consideration to evidence that the

7

factfinder could reasonably have found to be clear and convincing. *Boyd*, 131 S.W.3d at 611. We determine whether, based on the entire record, a factfinder could reasonably form a firm belief or conviction that the allegations were proven. *Id.*

The factfinder is the only judge of testimonial weight. *Willis v. Willis*, 533 S.W.3d 547, 556 (Tex. App.—Houston [14th Dist.] 2017, no pet.). When the testimony of witnesses is conflicting, we will not disturb the credibility determinations made by the factfinder, and we presume that the factfinder resolved any conflicts in favor of the verdict. *Syed*, 521 S.W.3d at 848.

**Characterization of Property**

Tom contends that the trial court made several characterization errors in the divorce decree. Specifically, he argues that the trial court erred by characterizing as community property 100% of the AIG 401(k), the severance payments that he received when his employment with AIG ended during the pendency of the divorce, and funds in an investment account. He argues that a portion of each of these assets should have been characterized as separate property. He also argues that the trial court erred by characterizing a 2014 Ford Mustang as Sherry's separate property. He further argues that while the trial court correctly characterized a 2017 Lexus as community property, the value that the court assigned to this vehicle failed to account for a $10,000 allowance Tom received when he traded in a separate-property vehicle to purchase the Lexus.

## A. Governing Law

In a divorce decree, the trial court "shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage." TEX. FAM. CODE § 7.001. Each spouse bears the burden to present sufficient evidence of the value of the community estate to enable the trial court to make a just and right division. *Fuentes v. Zaragoza*, 555 S.W.3d 141, 162 (Tex. App.—Houston [1st Dist.] 2018, no pet.). We review the trial court's rulings on the property division for an abuse of discretion. *Id.*; *Willis*, 533 S.W.3d at 551 ("We will not disturb the property division on appeal unless the appellant demonstrates that the trial court clearly abused its discretion by a division or an order that is manifestly unjust and unfair.").

The trial court has wide latitude in dividing the community estate, and we presume that the court properly exercised its discretion. *Fuentes*, 555 S.W.3d at 162; *Roberts v. Roberts*, 531 S.W.3d 224, 232 (Tex. App.—San Antonio 2017, pet. denied). The trial court abuses its discretion in dividing the community estate if insufficient evidence supports the division. *Fuentes*, 555 S.W.3d at 162.

A spouse's separate property consists of (1) the property owned or claimed by the spouse before marriage; (2) the property acquired by the spouse during marriage by gift, devise, or descent; and (3) the recovery for personal injuries sustained by the spouse during marriage, except any recovery for loss of earning capacity during

9

marriage. TEX. CONST. art. 16, § 15; TEX. FAM. CODE § 3.001; *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex. 1977) ("The nature of property is fixed by the Texas Constitution, and not by what is 'just and right.'").

By contrast, community property consists of the property, other than separate property, acquired by either spouse during the marriage. TEX. FAM. CODE § 3.002. The trial court lacks authority to divest a spouse of separate property. *Pearson v. Fillingim*, 332 S.W.3d 361, 364 (Tex. 2011) (per curiam); *Viera v. Viera*, 331 S.W.3d 195, 204 (Tex. App.—El Paso 2011, no pet.). "If the trial court mischaracterizes a spouse's separate property as community property and awards some of the property to the other spouse, then the trial court abuses its discretion and reversibly errs." *Sharma v. Routh*, 302 S.W.3d 355, 360 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

We presume that property possessed by either spouse during or on dissolution of the marriage is community property. TEX. FAM. CODE § 3.003(a); *Villalpando v. Villalpando*, 480 S.W.3d 801, 806 (Tex. App.—Houston [14th Dist.] 2015, no pet.). The spouse seeking to establish that property is separate property must establish the separate character of the property by clear and convincing evidence. TEX. FAM. CODE § 3.003(b); *Pearson*, 332 S.W.3d at 364 ("All property acquired during a marriage is presumed to be community property, and the burden is placed on the party claiming separate property to prove otherwise . . . ."); *Sink v. Sink*, 364 S.W.3d

340, 344 (Tex. App.—Dallas 2012, no pet.) ("[A] party who seeks to assert the separate character of property must prove that character by clear and convincing evidence.").

Generally, whether property is separate or community property is determined by its character at inception. *Barnett v. Barnett*, 67 S.W.3d 107, 111 (Tex. 2001); *Leax v. Leax*, 305 S.W.3d 22, 33 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *McClary v. Thompson*, 65 S.W.3d 829, 834 (Tex. App.—Fort Worth 2002, pet. denied) ("Most forms of property, including real estate, life insurance policies, and stock options, have been characterized as community or separate based upon their character at inception."). "Inception of title occurs when a party first has a right of claim to the property by virtue of which title is finally vested." *Sharma*, 302 S.W.3d at 360.

If the trial court mischaracterizes community property as separate property, that property does not get divided as part of the community estate. *Graves v. Tomlinson*, 329 S.W.3d 128, 153 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). If the mischaracterized property has value that would have affected the just and right division of the community estate, then the mischaracterization is harmful, and we must remand the entire community estate for a just and right division based upon the correct characterization of the property. *Id.*; *Garza v. Garza*, 217 S.W.3d 538, 549 (Tex. App.—San Antonio 2006, no pet.); *Boyd*, 131 S.W.3d at 617. If the

11

mischaracterization of the property had only a *de minimis* effect on the just and right division, then we need not remand the case to the trial court. *Garza*, 217 S.W.3d at 549; *Boyd*, 131 S.W.3d at 617.

**B.    Analysis**

**1.    401(k) Plan**

Tom contends that the trial court erred by characterizing his AIG 401(k) plan—a defined contribution plan—as entirely community property and awarding 78% of the plan's value to Sherry. He argues that it is undisputed that he worked for AIG—and made contributions to the 401(k)—for fifteen years before he married Sherry. He argues that the 401(k) had a balance of around $213,000 on the date he married Sherry and that this amount therefore constituted his separate property.

"[A] spouse's interest in a retirement or pension plan is regarded as a mode of employee compensation earned over the length of a given period of employment." *McClary*, 65 S.W.3d at 834. Benefits in a retirement or pension plan are earned over time, and courts use apportionment formulas—depending on whether the particular plan is a "defined contribution plan" or a "defined benefit plan"—to allocate to the community estate benefits in the plan that are earned during marriage. *Id.*; *Leax*, 305 S.W.3d at 33 ("[C]ontributions with earned income to 401(k)'s and retirement plans during marriage are community property.").

An employee participating in a defined contribution plan has an individual account, benefits are based solely on the contents of the employee's account, and the value of the account "can be ascertained at any time before retirement simply by looking at the account." *Hatteberg v. Hatteberg*, 933 S.W.2d 522, 530–31 (Tex. App.—Houston [1st Dist.] 1994, no writ). To determine the portion and the value of a defined contribution plan that is community property, courts subtract the amount contained in the plan at the time of marriage from the total contained in the account at the time of divorce. *McClary*, 65 S.W.3d at 835; *Smith v. Smith*, 22 S.W.3d 140, 149 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

It is undisputed that Tom began working for AIG in 1997 and that he married Sherry on November 6, 2012. Tom testified that $218,000 in the AIG 401(k) was his separate property because that was the value of the plan when he married Sherry. Lynn Bell Osina, a CPA, testified as Tom's tracing expert and stated that she had reviewed account statements "from third-party organizations that [Tom] had accounts with," including the AIG 401(k), to determine the value of those accounts on the date of marriage. Osina testified that, based on a statement from October 2012, the AIG 401(k) had a value of $212,510.10 before the marriage, and it increased in value by over $251,000 during the marriage.[1]

---

[1]     Osina completed a report that contained excerpts from Transamerica statements reflecting that, on October 1, 2012, the balance of the AIG 401(k) was $212,510.10. Although a copy of this report is included in the appellate record, the trial court

On the morning she testified, Osina was presented with a document purportedly from Transamerica, which administers the AIG 401(k). That document revealed that on the date of marriage, the balance in the account was $213,403.70. The trial court admitted a copy of this document, stating, "I believe the expert witness is able to tell me that this is what it purports to be. She seems to recognize where it's from and gave me testimony regarding that."

On cross-examination, Osina agreed that she had never seen quarterly or monthly financial statements for the AIG 401(k) from before the marriage. She based her analysis of the balance of the 401(k) on spreadsheets that Tom had provided to her, with the "understanding it came from Transamerica." When asked how that was her understanding, Osina replied, "Well, it's not written on the paperwork, that's for sure. But that's my understanding. He told me that's where he got them." On re-direct, Osina testified that the document admitted by the trial court was similar to statements from other financial institutions. She stated:

> It appears to be valid. It has a lot of details here. It shows the names of all of the—the various funds that he was in. It has dates that show the values. It shows the beginning balance. It shows the contributions that are made during the period from October to—October 1st to November

sustained Sherry's objection to this report and did not admit it as an exhibit. The trial court stated that it typically treats expert reports as learned treatises, allows the witness to testify from the report, and delivers the report to the court reporter to maintain with other exhibits, but it does not admit such reports as exhibits. The trial court also refused to admit a document purporting to be from Transamerica's records and reflecting a balance of $212,510.10 in the AIG 401(k) as of October 1, 2012, on the basis of an untimely business records affidavit.

the 30th. And it shows the transfers between the various funds, you know, the buys and the sells, and it shows the dividends that are received. It shows the change for the period, and it shows the ending balance. It's also my understanding that the statements—the original statements are not available anymore and that's why it had to come in this format rather than a statement.

Osina stated that another company administered the 401(k) plan before Transamerica. Due to this change, Tom did not have access to any statements prior to 2012, and the company "only [had] the documentation that comes from their computer programs." She stated that this is "fairly common" with 401(k) administrators.

In the divorce decree, the trial court awarded Sherry 78.65% of the total account balance in the AIG 401(k), which represented $368,344.55 as of the last date of trial. The court awarded Tom 21.35% of the total account balance in the AIG 401(k), which represented $100,000 as of the last date of trial. In its findings and conclusions, the trial court found that 100% of the AIG 401(k) was community property. The trial court further found:

> [Tom] admitted testimony to support his separate property claim relating to the AIG 401(k); therefore, failing to rebut the community property presumption. [Tom] failed to produce or offer a monthly, quarterly, or yearly statement from the financial statement pre-dating marriage to demonstrate the beginning balance of the AIG 401(k). [Tom] did not meet his burden to prove any separate property interest in the AIG 401(k) by clear and convincing evidence as required by Texas law.

On appeal, Sherry argues that Tom failed to meet his burden to prove, by clear and convincing evidence, what portion of the AIG 401(k) plan was his separate property. He did not offer any financial statements demonstrating the balance of the 401(k) before the date of marriage; instead, he offered only his testimony and Osina's testimony. Sherry argues that Osina only reviewed "the sparse, incomplete, and/or unauthenticated information provided to her directly by Tom that were found inadmissible by the trial court." She argues that because Tom provided only his testimony, which was insufficient to establish the separate character of a portion of the AIG 401(k), the trial court properly determined that the entire 401(k) was community property.

"A spouse is competent to testify concerning the characterization of property without producing independent documentation such as bank records." *Pace v. Pace*, 160 S.W.3d 706, 714 (Tex. App.—Dallas 2005, pet. denied); *see Vannerson v. Vannerson*, 857 S.W.2d 659, 667–68 (Tex. App.—Houston [1st Dist.] 1993, writ denied) (holding that wife adequately rebutted community presumption when trial court admitted two exhibits offered by wife identifying her separate property and husband's separate property and husband did not appear at trial to offer any contradictory evidence). Nevertheless, "[a]s a general rule, the clear and convincing standard is not satisfied by testimony that property possessed at the time the marriage is dissolved is separate property when that testimony is contradicted or unsupported

16

by documentary evidence tracing the asserted separate nature of the property." *Graves*, 329 S.W.3d at 139.

"Even though a witness may be interested in the outcome of the proceedings, as long as the testimony is 'clear, direct and positive, and free from contradiction, inaccuracies, and circumstances tending to cast suspicion thereon, it is taken as true, as a matter of law.'" *Monroe v. Monroe*, 358 S.W.3d 711, 718 (Tex. App.—San Antonio 2011, pet. denied) (quoting *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990) (per curiam)). The testimony of a spouse seeking to overcome the community presumption need not be corroborated to meet the clear and convincing burden of proof. *Id.*; *Pace*, 160 S.W.3d at 714. However, a party's unsupported and contradicted testimony may not meet the clear and convincing standard. *Pace*, 160 S.W.3d at 714; *see Monroe*, 358 S.W.3d at 718 ("But, if the spouse's testimony is contradicted, it may not meet the clear and convincing standard.").

We conclude that Tom presented evidence that rebutted the community presumption and established that a portion of the 401(k) was his separate property. Here, Osina supplied expert testimony "trac[ing] the values" of Tom's 401(k). She testified that she reviewed financial documents in making her report on tracing, and these documents reflected an account balance of more than $212,000 the month

before the marriage. The court also admitted the exhibit demonstrating that the balance of the account on the date of marriage was $213,403.70.

On appeal, Sherry urges us to ignore that document and Osina's testimony on the basis that Osina was not a tracing expert and had done no tracing analysis. The record proves otherwise. Osina gave her qualifications as a tracing expert at the beginning of her testimony, and Sherry did not challenge Osina's expert qualifications. The trial court expressly "accept[ed]" Osina "as an expert" and found that the admitted exhibit was "what it purports to be based on [Osina's] testimony."

Osina then testified to tracing the values of Tom's assets—including the 401(k)—before and after the marriage, concluding that the 401(k) plan had a balance before marriage of $212,510.10. Sherry did not object to this testimony, and it was not excluded. Osina was not required to go one step further—as Sherry now demands—and label this $212,510.10 figure as "separate property." Characterization of marital property is a legal conclusion. *Zamarripa v. Zamarripa*, No. 14-08-00083-CV, 2009 WL 1875580, at *2 (Tex. App.—Houston [14th Dist.] June 30, 2009, pet. denied) (mem. op.). A witness may not give legal conclusions or interpret the law to the jury. *Greenberg Traurig of New York, P.C. v. Moody*, 161 S.W.3d 56, 94–95 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (stating that expert witnesses may not testify to pure questions of law or to their understanding of law). This evidence was enough to meet Tom's burden.

18

By contrast, Sherry offered no evidence that Tom had a zero balance in his AIG 401(k) account before she married him. She did not testify at all regarding the balance prior to marriage, and she offered no documentary evidence that would justify characterizing the entire account as community property.

Accordingly, we agree with Tom that the trial court abused its discretion by characterizing the entire 401(k) as community property. *See Sharma*, 302 S.W.3d at 360 ("If the trial court mischaracterizes a spouse's separate property as community property and awards some of the property to the other spouse, then the trial court abuses its discretion and reversibly errs."); *see also Bush v. Bush*, 336 S.W.3d 722, 738 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (stating that trial court has wide discretion in dividing community estate, "but it must confine itself to the community property," and when trial court mischaracterizes property and abuses its discretion in property division, proper disposition is to remand case for new division of community estate).

### 2. AIG Severance Payments

Next, Tom argues that the trial court erred by characterizing the entire severance package that he received from AIG as community property. According to Tom, the amount of the severance package was based on his twenty-one years of service with AIG, and he worked for AIG for fifteen years before he married Sherry.

He argues that the trial court should have determined that the severance payments were part separate property, part community property.

During the pendency of the divorce proceedings, in September 2018, Tom lost his job with AIG. AIG presented Tom with a "Severance and Release Agreement," which he signed. This agreement provided that, upon termination, AIG would pay "two weeks' non working notice pay" regardless of whether Tom signed the agreement. If he signed the agreement, he would also receive a severance package. AIG acknowledged that Tom had 21 years of service with the company, beginning May 12, 1997, and it offered him 42 weeks of severance pay at his current salary. Tom could elect to receive the severance payment in a lump-sum or as a continuation of payroll. In exchange for the severance package, the agreement required Tom to waive and release any claims that he might have against AIG. The agreement stated that it did not "modify or affect any vested rights" under AIG's retirement plan. For Tom to be entitled to the severance payments and benefits mentioned in the agreement, he was required to sign the agreement within a specified time and not revoke it.

Tom accepted the severance package and elected to receive the payments as a continuation of payroll, to end July 26, 2019. Tom received a total of $171,557.76, comprised of 42 weeks' severance pay, two weeks' non working pay, and a "Severance Short Term Incentive Award Payment" of more than $41,000. At trial,

Tom agreed that if he had not signed the severance agreement, he would have only received "the two weeks of nonworking pay." Tom had not received all the severance payments by the time of trial in May 2019.

In its findings of fact and conclusions of law, the trial court found that 100% of the AIG severance payments were community property. The court stated, "In order to receive the Severance payments, [Tom] had to sign a release waiving any claims he may have had against AIG. Because [Tom's] property right only accrued once he signed the release of claims, severance payments are community property." The trial court further found that Tom elected to receive the severance payments over time, and the severance benefits would not be fully paid until July 26, 2019. The court stated, "As of April 5, 2019, at least $53,307.00 remained to be paid by AIG to [Tom] in relation to the severance, which is 100% community property." The trial court awarded 100% of the unpaid severance payments to Tom in the divorce decree.

On appeal, Tom argues that because the amount of his severance package—payment for 42 severance weeks, equal to two weeks for each of his 21 years of service to AIG—was based on his years of service, 15 of which occurred before he married Sherry, the severance payments should be treated like retirement benefits and apportioned between his separate estate and the community estate. Sherry argues that Tom received the severance payments during the marriage and would not have

21

received the payments had he not signed the severance agreement and agreed to release any claims he had against AIG; as a result, the severance payments were properly considered community property. We agree with Sherry.

To qualify as a retirement benefit that is capable of being apportioned between a spouse's separate estate and the community estate, the payment must be "an earned property right which accrued by reason of years of service" or must be a "form of deferred compensation which is earned during each month of service." *Henry v. Henry*, 48 S.W.3d 468, 476 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (quoting *Whorrall v. Whorrall*, 691 S.W.2d 32, 37 (Tex. App.—Austin 1985, writ dism'd)); *In re Marriage of Reinauer*, 946 S.W.2d 853, 857 (Tex. App.—Amarillo 1997, pet. denied); *Acosta v. Acosta*, 836 S.W.2d 652, 654 (Tex. App.—El Paso 1992, writ denied).

In *Henry*, the Fourteenth Court of Appeals addressed whether the trial court properly considered funds received as part of a "Discretionary Severance" package as part of the husband's "retirement benefits" and apportioned the funds between the husband's separate estate and the community estate. *See* 48 S.W.3d at 476–77. On appeal, the husband argued that the trial court properly apportioned the severance package because it was based, in part, on his years of service to the company, nine of which had occurred before he married. *Id.* at 472–73, 476. The severance documents admitted into evidence "demonstrate[d] that the severance package was

22

an inducement for [the husband], and everyone else offered such a package, to leave the company voluntarily." *Id.* at 476. The husband was required to sign an agreement releasing all claims against his employer to receive the severance package. *Id.*

For the severance package to qualify as a retirement benefit capable of being apportioned between the separate and the community estates, the payment "must be an 'earned property right which accrued by reason of years of service'" or it "must be a 'form of deferred compensation which is earned during each month of service.'" *Id.* (quoting *Whorrall*, 691 S.W.2d at 37). The documents from the husband's employer made it clear that the severance package "was purely discretionary with the company and was given only to induce his voluntarily leaving his employment and release any related claims he may have had against [the company]." *Id.* at 477; *see also Reinauer*, 946 S.W.2d at 857 ("[T]he payment must, at the very least, be a form of compensation accruing to the individual due to his years of service with the employer. Discretionary payments made for purposes other than as compensation earned during an employee's tenure do not satisfy these criteria and, thus, are not retirement pay or benefits."). The husband's property right in the severance funds accrued only when he signed the agreement releasing his claims against his employer. *Henry*, 48 S.W.3d at 477; *see Whorrall*, 691 S.W.2d at 38 (noting that IBM's "Special Payment" program "appear[ed] primarily to be an incentive to coax an employee into an early retirement" and fact that payment was "purely

discretionary with the company negates the notion that it is earned or accrued over the employee's tenure").

On these facts, the Fourteenth Court concluded that legally insufficient evidence supported the trial court's finding that the severance package was akin to a retirement benefit. *Henry*, 48 S.W.3d at 477. Consequently, the trial court should not have apportioned the payments between the husband's separate estate and the community estate. *Id.*

For the same reasons, we conclude that the trial court properly characterized the disputed severance pay as community property. Like the severance package in *Henry* and the "Special Payment" in *Whorrall*, the severance package offered to Tom in this case was discretionary with AIG. Furthermore, like the severance package in *Henry*, Tom's property right in these funds only accrued when he signed the severance agreement in which he agreed to release any claims he had against AIG. Had he not signed the severance agreement, he would not have been entitled to these funds.

Although AIG used Tom's years of service to calculate the amount of the severance package, the record contains no evidence that he accrued the right to receive a severance package during each of his years of service, fifteen of which occurred prior to his marriage to Sherry. Thus, on these facts, the AIG severance payments were neither an "earned property right which accrued by reason of years

24

of service" nor a "form of deferred compensation which is earned during each month of service." *See id.* at 476. The payments were not in the nature of a retirement benefit that could be apportioned between Tom's separate estate and the community estate. We hold that the trial court did not err by characterizing the AIG severance payments as community property.

### 3. E*Trade Account

Tom contends that, on the date of marriage, he had $23,000 in his Bank of America checking account. Two months later, after the marriage, he transferred $23,000 to an E*Trade investment account. At the time the trial court signed the divorce decree, that investment account had a balance of $172,391.01. That figure consisted of $122,668.05 in cash and 952 units of AIG stock. The trial court awarded 100% of the cash, assets, and securities in the E*Trade account to Sherry. Tom argues that $23,000 in the E*Trade account was his separate property, and he should be given a credit for the $23,000 in separate property that he had in that account.

Separate property will retain its character through a series of exchanges so long as the spouse asserting separate ownership can overcome the community property presumption by tracing the assets on hand during the marriage back to property that, because of its time and manner of acquisition, is separate in character. *Boyd*, 131 S.W.3d at 612. "Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse

originally obtained possession of the property." *Ganesan v. Vallabhaneni*, 96 S.W.3d 345, 354 (Tex. App.—Austin 2002, pet. denied). If the evidence demonstrates that separate and community property have been so commingled as to defy resegregation and identification, the community presumption prevails. *Garza*, 217 S.W.3d at 548; *Boyd*, 131 S.W.3d at 612; *McElwee v. McElwee*, 911 S.W.2d 182, 188 (Tex. App.—Houston [1st Dist.] 1995, writ denied).

When tracing separate property, it is not enough for the spouse to show that separate funds could have been the source of a subsequent deposit of funds. *Boyd*, 131 S.W.3d at 612. Any doubt concerning the character of the property should be resolved in favor of the community estate. *Id.*

Generally, when separate funds and community funds are commingled in a single bank account, we presume that community funds are withdrawn first, before separate funds are withdrawn. *Smith*, 22 S.W.3d at 146; *see Zagorski v. Zagorski*, 116 S.W.3d 309, 319–20 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Where there are sufficient funds at all times to cover the separate property balance in the account at the time of divorce, we presume that the balance remains separate property. *Smith*, 22 S.W.3d at 146. "The only requirement for tracing and the application of the community-out-first presumption is that the party attempting to overcome the community presumption produce clear evidence of the transactions

affecting the commingled account." *Id.* (quoting *Welder v. Welder*, 794 S.W.2d 420, 434 (Tex. App.—Corpus Christi–Edinburg 1990, no writ)).

At trial, the trial court admitted two documents that purported to be two pages of statements for Tom's Bank of America checking account. The first page is from the October 30, 2012 through November 28, 2012 statement period. This page reflects that the account balance was $23,726.58 on November 2, 2012, just before the marriage, and $23,855.89 on November 7, 2012, the day after the marriage.

The second page is from the December 28, 2012 through January 29, 2013 statement period, which is after the marriage.[2] This page reflects that $10,000 was transferred to an E*Trade account on January 23, 2013, and $13,000 was transferred to that same E*Trade account on January 28, 2013. These two pages also reflect other transactions involving the checking account after the parties married, including deposits of several of Tom's paychecks from AIG. The record contains no information about when the E*Trade account was opened. The record does contain some monthly statements for the E*Trade account, but the earliest statement is for March 2018 and the latest statement is for March 2019.

Tom's Bank of America checking account existed prior to his marriage to Sherry, and the funds in that account on the date of marriage would be his separate

---

[2] The record does not contain any documentation from the November 29, 2012 through December 27, 2012 statement period.

property. However, in between the date of his marriage and the dates of the two transfers of $23,000 to the E*Trade account, several of Tom's paychecks from AIG were deposited into the Bank of America checking account. "[A]ny spouse's personal income is community property." *McClary*, 65 S.W.3d at 834. Thus, at the time of the transfers to the E*Trade account, the Bank of America account included both separate and community funds. When a bank account includes both separate and community funds, we presume that community funds are withdrawn first. *Zagorski*, 116 S.W.3d at 319–20; *Smith*, 22 S.W.3d at 146. We therefore disagree with Tom that the $23,000 transferred to the E*Trade account was entirely his separate property.

Moreover, although the record indicates that the E*Trade account had more than $122,000 in cash at the time of the parties' divorce, much greater than the $23,000 deposited in January 2013, the only E*Trade account statements included in the record are from March 2018 through March 2019. Here, Tom essentially asks us to assume that, from the time the deposits were made in January 2013 until March 2018, when statements for the account appear in the record, the account only increased in value and never dipped below a $23,000 balance. Tom has not supplied us with clear and convincing evidence to justify this assumption. *See Smith*, 22 S.W.3d at 146 (stating that "where there are sufficient funds *at all times* to cover the

28

separate property balance in the account at the time of divorce, we presume that the balance remains separate property") (emphasis added).

We conclude that Tom has not established, by clear and convincing evidence, that $23,000 in the E*Trade investment account at the time of the parties' divorce was his separate property. *See Boyd*, 131 S.W.3d at 612 (stating that any doubt concerning character of property should be resolved in favor of community estate).

### 4. 2014 Mustang

Tom argues that the trial court erred by characterizing community property—specifically, a 2014 Ford Mustang that was titled in his name—as Sherry's separate property and awarding it to her. He argues that Sherry did not establish, by clear and convincing evidence, that the Mustang was a gift.

Sherry considered the Mustang to be her separate property because Tom gave it to her as a gift. She testified that Tom used her son's truck as a down payment on the Mustang and showed it to her later and stated, "This is what I just bought you. I'm not like your ex-husband. I bought you what you always wanted." Sherry stated that this car was her "dream car" and that her "50th birthday was coming up, so we were celebrating that."

After she and Tom separated, Tom left her numerous voicemails stating that the car was not hers and that he was coming to get it, regardless of where it was. Sherry testified that she was frightened after receiving these voicemails, and she did

29

not drive the car after receiving them because she "was scared he was going to come take it from wherever [she] was." Carolyn Michelle McCarty, Sherry's long-time friend, testified that Tom gave Sherry a red Ford Mustang as a gift for her fiftieth birthday. She stated that she had a conversation with Tom at Sherry's birthday celebration, and he acknowledged that he bought the Mustang for Sherry because "[s]he wanted that red one."

Tom disagreed that the Mustang was a gift to Sherry. He testified that Sherry and McCarty were "not understanding the intent which was the use of the Mustang," which is why he kept title to it in his name, instead of placing title in Sherry's name. Neither party offered documentary evidence concerning the Mustang, such as the title to the vehicle. The trial court found that Tom gifted the Mustang to Sherry, and therefore it was her separate property.

A gift is a voluntary transfer of property to another made gratuitously and without consideration. *Maldonado v. Maldonado*, 556 S.W.3d 407, 414 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *Magness v. Magness*, 241 S.W.3d 910, 912 (Tex. App.—Dallas 2007, pet. denied). The elements of a gift are (1) the intent to make a gift; (2) delivery of the property; and (3) acceptance of the property. *Maldonado*, 556 S.W.3d at 414–15; *Magness*, 241 S.W.3d at 912. Donative intent may be established through direct or circumstantial evidence. *In re Marriage of Tuttle*, 602 S.W.3d 9, 13 (Tex. App.—Amarillo 2020, no pet.); *Rusk v. Rusk*, 5

S.W.3d 299, 303 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) ("One controlling factor is the donative intent of the grantor at the time of the conveyance."). A spouse may make a gift of property to the other spouse, and property acquired by gift during marriage is that spouse's separate property. *Maldonado*, 556 S.W.3d at 414; *Magness*, 241 S.W.3d at 912. "The burden of proving that property was acquired by gift is on the recipient." *Maldonado*, 556 S.W.3d at 415; *see* TEX. FAM. CODE § 3.003 (providing that degree of proof necessary to establish that property is separate property is clear and convincing evidence); *Pearson*, 332 S.W.3d at 364 (stating that party seeking to establish that property is separate property bears burden to rebut community presumption).

Here, the parties presented conflicting evidence to the trial court concerning Tom's donative intent with respect to the Mustang. Sherry and McCarty, a friend of Sherry's but also an uninterested witness, testified that Tom gave the Mustang—Sherry's "dream car"—to Sherry for her fiftieth birthday. Tom, on the other hand, testified that while he intended for Sherry to use the Mustang, he did not intend to gift it to her, stating that he kept title to the Mustang in his name.

In light of the conflicting testimony, this is a question of credibility of the witnesses, a matter that was within the province of the trial court to decide as the factfinder. *See Willis*, 533 S.W.3d at 556; *see also Harrison v. Harrison*, 321 S.W.3d 899, 903 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (stating, in case in which

31

parties disagreed about husband's donative intent with respect to purchase of property for wife, that "[t]his conflict is a question of the credibility of the witnesses" and deferring to trial court's decision to believe wife's testimony that property was gift). We presume that the trial court resolved this conflict in the testimony in favor of Sherry, and we will not disturb the trial court's credibility determination. *See Syed*, 521 S.W.3d at 848.

Viewing the evidence in the light most favorable to the finding, a reasonable factfinder could have formed a firm belief that Tom intended to gift the Mustang to Sherry. *See Harrison*, 321 S.W.3d at 904. We hold that the trial court did not abuse its discretion in determining that the Mustang was a gift to Sherry and therefore was her separate property.

### 5. Denial of credit for separate property trade-in allowance

In the divorce decree, the trial court awarded a 2017 Lexus to Tom and stated that the estimated value of this vehicle was $34,944.00. In its findings and conclusions, the trial court found that 100% of this vehicle was community property. On appeal, Tom argues that the trial court correctly awarded this vehicle to him, but it erroneously listed the value of the Lexus as $34,944, which did not account for a $10,000 allowance Tom received when he traded in a separate property vehicle to purchase this Lexus.

At trial, Tom testified that he has $10,000 of separate property in the Lexus, "reflected in the invoice of my trade-in of my separate property—previous Lexus—a 2008 gold RX 350." The trial court sustained Sherry's hearsay objection to this testimony. When Tom introduced the sales invoice for the 2017 Lexus, which purportedly showed a $10,000 trade-in allowance, the trial court again sustained Sherry's hearsay objection to this exhibit. Therefore, the only evidence in the record that Tom had traded in a separate property vehicle to purchase the 2017 Lexus was Tom's own testimony.

Separate property retains its character through a series of exchanges so long as the spouse asserting separate ownership can overcome the community property presumption by tracing the assets on hand during the marriage back to property that, because of its time and manner of acquisition, is separate in character. *Boyd*, 131 S.W.3d at 612. "Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property." *Ganesan*, 96 S.W.3d at 354.

Mere testimony that property was purchased with separate property funds, without any tracing of the funds, is generally insufficient to rebut the community presumption. *Boyd*, 131 S.W.3d at 612; *McElwee*, 911 S.W.2d at 188; *see Bush*, 336 S.W.3d at 743 ("It is well established that, in order to show that property purchased during the marriage is separate property, it is not enough to simply state that the

funds used to purchase the property were separate property funds; instead there *typically* must be some sort of documentary tracing to show that the funds used were separate property.").

Here, Tom offered no admissible evidence aside from his own testimony that a portion of the purchase price of the 2017 Lexus—$10,000—was his separate property. His testimony alone, without any evidence tracing the funds, is insufficient to rebut the community presumption and establish that a portion of the Lexus is separate property. *See Bush*, 336 S.W.3d at 743; *McElwee*, 911 S.W.2d at 188. We conclude that the trial court did not err by not crediting the $10,000 trade-in allowance.

## C.    *Issues Concerning Alleged Trust*

In several issues, Tom argues that the trial court erred by finding that he is the beneficiary of a trust and awarding 60% of his interest in any trust to Sherry because there is no evidence in the record that a current trust exists. Instead, there is only evidence that he is the beneficiary of a testamentary trust, created by the will of Tom's still-living father, and therefore he has no present interest in any trust property.

### 1.    Relevant facts

During the pendency of the litigation, Tom sent a document to his counsel describing background information on the parties and their relationship. This

document concluded by stating, "My overall strategy is to get this over and done with as quickly as possible. I also have Family money in a trust fund to offer a cash option to entice an earlier settlement." This document was inadvertently produced to Sherry's counsel along with other documents responsive to written discovery requests. Sherry's counsel notified Tom's counsel, and Tom's counsel immediately sought to have the document returned pursuant to the "snap-back" provision in Texas Rule of Civil Procedure 193.3(d).

According to Tom's counsel, Sherry's counsel agreed to disregard the document, "but then it was brought up several months later," and the parties sought a ruling from the trial court on whether the document was admissible. At the beginning of trial, the trial court "conditionally sustain[ed]" Tom's objection to the document, explaining that, "if you attempt to use it, affirmatively, [Sherry's counsel] has the right to bring it to my attention." The trial court stated that it would then do an in camera inspection of the document and make a ruling on admissibility.

Sherry testified that Tom "has money set aside, I'm sure." She stated that Tom had told her "over and over" during the course of their relationship that his parents set up a trust fund for him and that "when his parents die, he's going to get millions and millions of dollars." She agreed with her counsel that during the pendency of the divorce, Tom's position has been that he does not have an interest in a trust. She requested that she be awarded a percentage of any trust that exists.

Sherry's counsel questioned Tom about the existence of a trust on cross-examination. The following exchange occurred:

Q. Mr. Kelly, do you have a trust?

A. No.

Q. Have you ever told anybody that you have a trust in any form, whatsoever?

A. I have used a metaphor for my dad's assets that came across in the form of that document which you got that said I would use trust money. There are no—as of today and during this case, there is not a Kelly trust in existence.

The Court: When did it go out of existence, sir?

A. Your Honor, it is a trust that is based upon my parents' death.

The Court: So it's there?

A. No, it's not.

The Court: It will not be created until they die.

A. Created upon death. They are both living as if I saw them at 7:00 o'clock this morning.

. . . .

Q. Okay. So it's your testimony that there is a trust; it's just your interest, if any, doesn't, what, vest until your parents die?

A. There's not an active trust as of today nor ever during our marriage or separation.

Q. So what is it, Mr. Kelly? You just testified a few moments that there—there is a trust. Are there documents in existence?

A. I'm—I'm trying to find the best way to explain this in a direct answer. There are no active trusts. There are no

36

> active trusts of—any Kelly family's name today nor have there been in the past.
>
> Q.      Then what were you just talking about to the judge a few moments ago?
>
> A.      There's a will, and the will has conditions. And I'm not going to talk about my dad's conditions in his will.

At the end of this exchange, the trial court stated, "I think there's enough of a mystery that the Court is prepared at this time to rule on that document," referring to the document Tom had sent to his counsel.

Tom's counsel again objected that the document was covered by attorney-client privilege and that, under the snap-back provision, Sherry's counsel was required to disregard or delete it after it had been inadvertently produced. Sherry's counsel acknowledged the snap-back provision but argued that the document was not covered by attorney-client privilege because it instead fell within the crime/fraud exception to that privilege.[3] Sherry's counsel stated, "I think it is an active act of

---

[3] The attorney-client privilege does not apply "[i]f the lawyer's services were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud." TEX. R. EVID. 503(d)(1). A party asserting this exception to the privilege must show: (1) a prima facie case of the contemplated crime or fraud; and (2) a nexus between the communications at issue and the crime or fraud. *In re USA Waste Mgmt. Res., L.L.C.*, 387 S.W.3d 92, 98 (Tex. App.—Houston [14th Dist.] 2012, orig. proceeding [mand. denied]). Mere allegations of fraud are insufficient. *Id.* "A prima facie showing is sufficient if it sets forth evidence that, if believed by a trier of fact, would establish the elements of a fraud or crime that 'was ongoing or about to be committed when the document was prepared.'" *In re Gen. Agents Ins. Co. of Am., Inc.*, 224 S.W.3d 806, 819 (Tex. App.—Houston [14th Dist.] 2007, orig. proceeding) (quoting *Coats v. Ruiz*, 198 S.W.3d 863, 876 (Tex. App.—Dallas 2006, no pet.)).

fraud to conceal it. This isn't a past fraud. This is a current ongoing fraud that's being committed against my client and the Court, frankly. And I think there's an absolute duty to disclose it." The trial court ruled that the challenged sentence in the document—"I also have Family money in a trust fund to offer a cash option to entice an earlier settlement."—was not protected by the attorney-client privilege because it fell within the crime/fraud exception.

Tom's brother, Matthew Kelly, testified that he was not aware of any trusts that had been set up for Tom's benefit, and he had no reason to believe that his family had set up such a trust. At the close of Matthew's testimony, he had the following exchange with the trial court:

The Court: I just have one thing that I need to make sure I put on the record. Sir, are you aware of any trust in existence or promise or spendthrift trust or anything that has a potential benefit for your brother; and it could be yourself as well?

Matthew: No, ma'am.

The Court: There is no trust?

Matthew: No, ma'am, there's not.

In the final divorce decree, the trial court awarded to Sherry "60% of any interest, whether such interest is in the corpus or income, of any trust in which [Tom] has an interest" and ordered Tom to "surrender to [Sherry] 60% of any distributions and assets received with respect to said trusts within three days of receipt." The trial

court awarded to Tom "40% of any trust in which [Tom] has an interest." In its findings of fact and conclusions of law, the trial court stated:

> The Court also finds that [Tom] attempted to defraud this Court by not disclosing property interests in, or correct balances in, property accounts by setting his own final date of production and his own personal interpretation of character of the property. The Court finds that [Sherry] should receive 60% of the marital estate and have judgment for 60% of any trust, if such a trust exists, based on [Tom's] admission to this court in trial testimony, despite denials of the existence of such a trust. Right-of-ownership of that trust benefit for [Tom] shall be shared 60/40 with [Sherry] based on fraudulent contact.

The trial court also found that "100% of [Tom's] beneficial interest in any trust" was community property.

## 2. Existence of a trust

Tom argues that the trial court erred by awarding Sherry 60% of any interest that Tom may have in any trust because there was no evidence presented of an existing trust or trust income. He argues that, to the extent he has an interest in a testamentary trust under his father's will, this is not a present interest because his father is still alive and, moreover, any property that he acquires by inheritance is his separate property. He further argues that, even if a trust is currently in existence and he is a beneficiary, trust corpus created by a gift is separate property and distributions of trust corpus during marriage retains the separate property character of the corpus.

Immediately upon a person's death, all the person's estate that is devised by a will vests in the devisees. TEX. EST. CODE § 101.001(a)(1); *Dyer v. Eckols*, 808

S.W.2d 531, 533 (Tex. App.—Houston [14th Dist.] 1991, writ dism'd by agr.) ("Texas law provides that legal title vests in estate beneficiaries immediately upon death of the donor."). Until a testator's death, a testator is free to terminate a testamentary trust and dispose of its assets. *Longaker v. Evans*, 32 S.W.3d 725, 734 (Tex. App.—San Antonio 2000, pet. withdrawn) (en banc). As a result, a prospective beneficiary under a will has only an expectation that he will inherit that is subject to the testator's ability to change their mind and dispose of their assets in a different manner. *See Archer v. Anderson*, 556 S.W.3d 228, 234 (Tex. 2018) ("But a prospective beneficiary has no right to a future inheritance; he has only an expectation that is dependent on the donor's exercise of his own right."); *Jinkins v. Jinkins*, 522 S.W.3d 771, 782 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (noting that while will is generally revocable at any time before testator's death, whether trust is revocable depends on terms of instrument creating it).

Earnings from the separate estate of one spouse are community property. *Benavides v. Mathis*, 433 S.W.3d 59, 63 (Tex. App.—San Antonio 2014, pet. denied). "Trust income which a married beneficiary does not receive, and to which he has no claim other than an expectancy interest in the corpus, has been held to constitute separate property." *Ridgell v. Ridgell*, 960 S.W.2d 144, 148 (Tex. App.—Corpus Christi–Edinburg 1997, no pet.); *Sharma*, 302 S.W.3d at 361 ("[D]istributions from testamentary or inter vivos trusts to married recipients who

40

have no right to the trust corpus are the separate property of the recipient because these distributions are received by gift or devise.").

Income that a married beneficiary receives on trust corpus to which the beneficiary is entitled, or becomes entitled, is community property. *Ridgell*, 960 S.W.2d at 148. If the spouse does not receive income from the trust and "has no more than an expectancy interest in the corpus[], the income remains separate property." *Id.* "[I]n the context of a distribution of trust income under an irrevocable trust during marriage, income distributions are community property only if the recipient has a present possessory right to part of the corpus, even if the recipient has chosen not to exercise that right, because the recipient's possessory right to access the corpus means that the recipient is effectively an owner of the trust corpus." *Benavides*, 433 S.W.3d at 63; *Sharma*, 302 S.W.3d at 364. Whether a spouse has a present possessory right to the trust corpus, as well as the rights the spouse has to income distributions, is determined by examining the documents that create the trust. *See Benavides*, 433 S.W.3d at 63–64.

Here, the trial court had before it no documents setting out the terms of any trust to which Tom was a beneficiary. Instead, the trial court had the document that Tom sent to his attorney, which only referenced "Family money in a trust fund" that he could potentially use "to offer a cash option to entice an earlier settlement." At trial, Tom repeatedly denied that a trust currently existed to which he was a

41

beneficiary. He testified that his father's will contained provisions creating a testamentary trust to which he was a beneficiary, but his father was still alive so he had no present interest in any trust. Tom did not testify to the terms of a testamentary trust, and his father's will was not admitted into evidence.

To the extent the trust at issue, if one exists, is a testamentary trust created by the will of Tom's father, we agree with Tom that because his father is still alive, any interest he has in that trust is a mere expectancy and is not part of the parties' community estate subject to division by the trial court. *See Archer*, 556 S.W.3d at 234; *see also Dickinson v. Dickinson*, 324 S.W.3d 653, 659 (Tex. App.—Fort Worth 2010, no pet.) ("[B]ecause appellant is not entitled to any distribution of the Trust corpus until [the death of the life estate beneficiary] or voluntary vacancy of the real property—which had not occurred at the time of trial—his remainder interest cannot be characterized as community property."), *abrogated on other grounds by In re A.E.A.*, 406 S.W.3d 404 (Tex. App.—Fort Worth 2013, no pet.). To the extent the trust at issue is an inter vivos trust, as suggested by the document Tom sent to his counsel, we have no evidence before us concerning the terms of that trust. There is no evidence in the record concerning when that trust was created, by whom it was created, whether Tom is entitled to distributions of any trust income, the terms under which he is entitled to income distributions, whether the trustee has discretion to withhold distributions, or whether Tom has a present right to the trust corpus.

A spouse's interest in the trust corpus and the trust income—and whether that interest is the spouse's separate or community property—is dependent on the terms of the particular trust. *See, e.g.*, *Benavides*, 433 S.W.3d at 64–67 (considering terms of trust document in determining whether trust was irrevocable and whether husband had present possessory interest in trust corpus such that distributions received during marriage were community property); *Sharma*, 302 S.W.3d at 364–68 (considering language of will creating trusts at issue in determining whether husband had present possessory right to trust corpus). In the absence of any evidence in the record concerning the terms of this trust, if an inter vivos trust exists, we conclude that the trial court abused its discretion by considering 100% of Tom's interest, if any, in the trust to be community property and dividing that interest between the parties.[4] *See Syed*, 521 S.W.3d at 847 (considering whether trial court had sufficient information upon which to exercise its discretion and whether it erred in its application of that discretion).

Because we conclude that the trial court erred in characterizing the AIG 401(k) and Tom's interest, if any, in a trust, we remand the portion of the divorce decree dividing the parties' marital estate for a new property division. *See Jacobs v.*

[4]    Because we conclude that, on the record before it, the trial court erred by considering any trust in which Tom has an interest to be community property and by dividing that interest between the parties, we need not address whether admission of the document Tom sent to his counsel violates the attorney-client privilege or whether that document fell within the crime/fraud exception to that privilege.

*Jacobs*, 687 S.W.2d 731, 733 (Tex. 1985) (stating that if reversible error exists that affects just and right division of property, appellate court must remand entire community estate for new division); *Wilson v. Wilson*, 132 S.W.3d 533, 536 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (same). As a result, because we order the trial court to conduct a new property division, we need not address several issues that Tom raises on appeal, including whether the trial court erred in disproportionately dividing the marital estate in favor of Sherry, math errors in the divorce decree, and valuation and division of certain assets.

### Spousal Maintenance

Tom also contends that the trial court erred by awarding spousal maintenance to Sherry. He argues that Sherry does not meet the eligibility requirements for maintenance because she received sufficient property in the divorce decree to provide for her minimum reasonable needs. He further argues that Sherry presented legally insufficient evidence that she had a disability that prevented her from obtaining employment.

### A. *Governing Law*

Family Code Chapter 8 governs the award of spousal maintenance in a divorce decree. *See* TEX. FAM. CODE §§ 8.001–.305; *Dalton v. Dalton*, 551 S.W.3d 126, 130 (Tex. 2018) ("In 1995, the Texas Legislature first authorized courts to award a form of involuntary post-divorce alimony referred to as 'spousal maintenance.'"). The

44

Family Code defines "maintenance" as "an award in a suit for dissolution of a marriage of periodic payments from the future income of one spouse for the support of the other spouse." TEX. FAM. CODE § 8.001(1).

Spousal maintenance is allowed "only under 'very narrow' and 'very limited' circumstances.'" *Dalton*, 551 S.W.3d at 130 (quoting *McCollough v. McCollough*, 212 S.W.3d 638, 645 (Tex. App.—Austin 2006, no pet.), and *Cardwell v. Sicola-Cardwell*, 978 S.W.2d 722, 724 n.1 (Tex. App.—Austin 1998, no pet.)); *O'Carolan v. Hopper*, 71 S.W.3d 529, 533 (Tex. App.—Austin 2002, no pet.) (stating that purpose of maintenance is "to provide temporary and rehabilitative support for a spouse whose ability for self-support is lacking or has deteriorated over time while engaged in homemaking activities and whose capital assets are insufficient to provide support"). The trial court may order maintenance for a spouse only if the spouse seeking maintenance will lack sufficient property, including the spouse's separate property, on dissolution of the marriage to provide for the spouse's minimum reasonable needs and the spouse:

> (A)   is unable to earn sufficient income to provide for the spouse's minimum reasonable needs because of an incapacitating physical or mental disability;
>
> (B)   has been married to the other spouse for 10 years or longer and lacks the ability to earn sufficient income to provide for the spouse's minimum reasonable needs; or
>
> (C)   is the custodian of a child of the marriage of any age who requires substantial care and personal supervision because of a physical or mental disability that prevents the spouse from earning

sufficient income to provide for the spouse's minimum reasonable needs.

TEX. FAM. CODE § 8.051(2); *Cooper v. Cooper*, 176 S.W.3d 62, 65 (Tex. App.—Houston [1st Dist.] 2004, no pet.) ("To be eligible for spousal maintenance, appellee must first have shown she lacked sufficient property to provide for her minimum reasonable needs.").

If the court determines that a spouse is eligible to receive maintenance, the court "shall determine the nature, amount, duration, and manner of periodic payments by considering all relevant factors." TEX. FAM. CODE § 8.052. Section 8.052 sets out a non-exclusive list of eleven factors to consider, including "each spouse's ability to provide for that spouse's minimum reasonable needs independently, considering that spouse's financial resources on dissolution of the marriage" and "the age, employment history, earning ability, and physical and emotional condition of the spouse seeking maintenance." *Id.* § 8.052(1), (4). The Family Code also contains limits on the duration and the amount of maintenance awards. *See id.* §§ 8.054–.055.

We review a trial court's award of maintenance for an abuse of discretion. *Fuentes*, 555 S.W.3d at 171; *Roberts*, 531 S.W.3d at 227 ("Absent a clear abuse of discretion, we do not disturb the trial court's decision to award spousal maintenance."). The trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support the decision or if reasonable

46

minds could differ as to the result. *Amos v. Amos*, 79 S.W.3d 747, 749 (Tex. App.—Corpus Christi–Edinburg 2002, no pet.).

## B.      *Relevant Facts*

In her divorce petition, Sherry sought an award of post-divorce spousal maintenance. At trial, Sherry testified concerning her employment and medical history. Sherry has a high school degree and some college education. She had previously worked as a substitute art teacher in the Alief Independent School District. She had also worked in a sales position at Star Furniture for ten years until 2013, but she quit in part because walking ten to twelve hours per day in a large building with a concrete floor had a detrimental effect on her physical health. She worked part-time for a company called CLH Strapping for a year-and-a-half handling invoices. Her employment there ended when the company went out of business in 2016. After that, Sherry helped friends and people who were downsizing and moving into smaller houses sell their belongings. Sherry estimated that she made around $3,000 doing this in 2016, between $3,000 and $5,000 in 2017, and between $6,000 and $8,000 in 2018. She was not doing this work at the time of trial.

Sherry also testified that she received "full disability" benefits from the Social Security Administration. She had received a $37,050 lump-sum payment from the Social Security Administration in March 2019 after it determined that she was

disabled. After paying expenses, around $10,000 of the original deposit remained in a savings account.

Sherry testified that her health was "not good" and that she has lower back pain, post-traumatic stress disorder ("PTSD"), diabetes, osteoarthritis, psoriatic arthritis, "enbulged" vertebrae, bad knees, a sleep disorder, problems remembering things, and problems with her hands "locking up." Sherry has had health problems since she was around eight years old, but they worsened around 2010, before she married Tom. She stated that her health further deteriorated during the marriage, in part due to the large amount of walking that working at Star Furniture required, and in part due to Tom's bullying, which increased the problems with her sleep disorder and PTSD. She testified that she was taking "new medications because of it."

The trial court admitted Sherry's "Financial Information Statement." This document reflected that Sherry's net monthly income from her Social Security payments is $1,591.70. She estimated that her monthly expenses—including rent, utilities, food and groceries, car-related expenses, medical expenses not covered by insurance, car and life insurance, and personal expenses—totaled $3,590. Sherry testified that she considered these expenses to be her "minimum needs." Tom did not object to this document or challenge the necessity of these expenses. Sherry stated that her health insurance does not cover all her medications, and she spends, out of pocket, anywhere from $300 to $600 per month on medications. She requested

that the trial court award her $1,998 in maintenance per month, the difference between her estimated monthly expenses and the income she receives from Social Security.

On cross-examination, Tom's counsel asked Sherry whether she could return to being a substitute teacher. Sherry responded that she could not because she cannot sit or stand for long periods, and she has PTSD and sleep anxiety. She stated that she cannot sit or stand for long periods due to osteoarthritis and psoriatic arthritis, which has caused a loss of cartilage in her hips. When she walks, her "hip slips," and she also needs surgery on her knees. She stated, "So for different reasons, to work at a school, it would not be conducive to my health." She further stated that "right now," there was no work that would be conducive to her health. Sherry testified that she could not return to her job at Star Furniture for similar reasons: she cannot stand for long periods of time, the job requires her to carry a laptop around with her all day, "the stress," and "not remembering things." Sherry won several sales awards while at Star Furniture, and she agreed that she was a model employee who would be "eligible for rehire if [she] went back, but [she] can't."

Tom testified that he believed Sherry is able to work. He stated that Sherry filed for Social Security disability benefits in 2016 "as an attempt to get funds when she could have worked." He testified that Sherry "woke up every morning, could shower," and she "was active." He also believed that, in applying for disability

49

benefits, Sherry did not accurately report her income. He acknowledged, however, that he had been concerned about Sherry's health problems when they married in 2012. He stated that Sherry received a diabetic pump in 2016, and he observed "from 2016 to present," Sherry's "overall capacity has diminished."

In the divorce decree, the trial court found that Sherry was eligible for maintenance under Family Code section 8.051(2)(A) and ordered Tom to pay $1,952 per month to Sherry for 25 months. The trial court made the following findings of fact and conclusions of law relevant to the maintenance award:

24.   [Tom] has an earning capacity of approximately $205,000.00 per year.

25.   [Sherry] has little to no future earning [capacity] and suffers from various physical disabilities and mental ailments, for which the Social Security Administration has determined that she is disabled.

30.   [Sherry] meets the requirements for spousal maintenance for a disability under the Texas Family Code in the amount of $2,000.00 per month for 36 months, beginning on June 1, 2019, and continuing on the first day of each month thereafter for a term of 36 months, and that the maintenance will be subject to a Wage Withholding Order.

31.   The Court finds that [Tom] should receive a credit against the post-divorce spousal maintenance in the amount of $23,200.00, representing direct payments from [Tom] to [Sherry] for interim spousal support while this suit was pending.

The trial court also awarded Sherry $1,611.30 per month in temporary spousal support pending appeal. Tom does not challenge this award of temporary spousal support.

50

*C.     Analysis*

### 1.      Presumption against maintenance

Tom contends that the trial court erred in awarding maintenance to Sherry because a legal presumption exists that maintenance is not warranted unless the spouse seeking maintenance has exercised diligence in earning sufficient income or developing the necessary skills to provide for the spouse's minimum reasonable needs. *See* TEX. FAM. CODE § 8.053(a). Tom argues that no evidence was presented that Sherry was seeking work or attempting to develop skills to provide for her needs, and therefore the award of maintenance was erroneous.

Family Code section 8.053(a) provides:

(a)     It is a rebuttable presumption that maintenance *under Section 8.051(2)(B)* is not warranted unless the spouse seeking maintenance has exercised diligence in:

(1)     earning sufficient income to provide for the spouse's minimum reasonable needs; or

(2)     developing the necessary skills to provide for the spouse's minimum reasonable needs during a period of separation and during the time the suit for dissolution of the marriage is pending.

*Id.* (emphasis added). Maintenance under Family Code section 8.051(2)(B) is permissible when the spouse seeking maintenance "has been married to the other spouse for 10 years or longer and lacks the ability to earn sufficient income to provide for the spouse's minimum reasonable needs." *Id.* § 8.051(2)(B); *Day v. Day*, 452 S.W.3d 430, 434 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).

This Court has previously held, however, that under the plain language of section 8.053(a), the statutory presumption only applies to maintenance sought pursuant to section 8.051(2)(B). *Benoit v. Benoit*, No. 01-15-00023-CV, 2015 WL 9311401, at *5 (Tex. App.—Houston [1st Dist.] Dec. 22, 2015, no pet.) (mem. op.); *Smith v. Smith*, 115 S.W.3d 303, 307 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.) (stating that presumption in section 8.053 does not apply to spouse "who is unable to seek employment due to an incapacitating physical or mental disability"). If the spouse seeks maintenance pursuant to either section 8.051(2)(A) or (C), the presumption in section 8.053(a) does not apply and the spouse is not required to present evidence that they have exercised diligence in earning sufficient income or in developing the necessary skills to provide for their minimum reasonable needs. *See Benoit*, 2015 WL 9311401, at *5.

Here, the divorce decree stated that Sherry was eligible for spousal maintenance under Family Code section 8.051(2)(A). *See* TEX. FAM. CODE § 8.051(2)(A) (providing that trial court may award maintenance if spouse "is unable to earn sufficient income to provide for the spouse's minimum reasonable needs because of an incapacitating physical or mental disability"). Because Sherry did not seek—and the trial court did not award—maintenance under section 8.051(2)(B), the presumption in section 8.053(a) did not apply. *See Benoit*, 2015 WL 9311401, at *5. We conclude that Sherry had no obligation to present evidence that she had

52

exercised diligence in earning sufficient income or developing the necessary skills to provide for her minimum reasonable needs. *See id.*; TEX. FAM. CODE § 8.053(a).

### 2. Evidence of disability

Tom further argues that Sherry did not present sufficient evidence that she had a disability justifying maintenance payments under Family Code section 8.051(2)(A). He points out that Sherry did not introduce any medical records, nor did any of her doctors testify concerning her medical conditions. He argues that her testimony that she was disabled, by itself, is not sufficient to support a maintenance award.

No authority directly addresses the quantum of evidence that is required to prove incapacity in an action for maintenance. *Roberts*, 531 S.W.3d at 228–29; *Smith*, 115 S.W.3d at 309; *Pickens v. Pickens*, 62 S.W.3d 212, 215 (Tex. App.— Dallas 2001, pet. denied). The Family Code does not require a spouse seeking maintenance due to an incapacitating physical or mental disability to present medical evidence. *Roberts*, 531 S.W.3d at 228; *Pickens*, 62 S.W.3d at 215 (contrasting provisions in Family Code concerning maintenance with state statutory provisions relating to workers' compensation benefits and federal statutory provisions relating to social security benefits, both of which expressly require medical evidence). Absent a statutory requirement, "testimony on incapacity need not be limited to experts." *Pickens*, 62 S.W.3d at 215.

As the factfinder, the trial court may reasonably infer an individual's incapacity from circumstantial evidence or the competent testimony of a lay witness. *Roberts*, 531 S.W.3d at 228; *Smith*, 115 S.W.3d at 309; *Pickens*, 62 S.W.3d at 215. Questions relating to the extent and duration of incapacity can be answered by lay opinion testimony, and medical testimony is not required. *Pickens*, 62 S.W.3d at 216. "In fact, the testimony of the injured party will support a finding of incapacity even if directly contradicted by expert medical testimony." *Roberts*, 531 S.W.3d at 228 (quoting *Pickens*, 62 S.W.3d at 216). However, the testimony "must still be sufficient and probative to establish a disability exists and to establish this disability prevents that party from obtaining gainful employment." *Id.* at 230; *see Chafino v. Chafino*, 228 S.W.3d 467, 475 (Tex. App.—El Paso 2007, no pet.) (concluding that trial court did not abuse its discretion in declining to award maintenance when wife testified about her medical problems, but record contained no "explanation of why her ailments prevent her from returning to work as a bookkeeper"). The party seeking maintenance must present probative evidence "that rises above a mere assertion that unsubstantiated symptoms collectively amount to an incapacitating disability." *Roberts*, 531 S.W.3d at 230.

At trial, Sherry testified concerning her medical conditions. She stated that she had had health concerns since she was a child, but these concerns worsened around 2010, before she married Tom. She testified that she has lower back pain,

PTSD, diabetes, osteoarthritis, psoriatic arthritis, "enbulged" vertebrae, bad knees, a sleep disorder, memory problems, and problems with her hands "locking up." The Social Security Administration has determined that she is disabled. Sherry takes multiple medications to manage her health problems. She previously worked in sales at Star Furniture, but the large amount of walking that job required exacerbated her health problems, particularly the problems with her hips and knees.

The problems with her hips and knees—as well as her PTSD, sleep problems, and anxiety—are also why she could not return to work as a substitute teacher. Although Tom believed that Sherry could return to work, he acknowledged that she has a history of health problems. He also testified that, since 2016, Sherry's "overall capacity has diminished." Sherry did not present medical records or testimony from her doctors, but that evidence is not required by the Family Code to demonstrate incapacity in maintenance cases. *See Roberts*, 531 S.W.3d at 228; *Pickens*, 62 S.W.3d at 215.

We conclude that Sherry presented evidence that is "more probative than [her] mere assertion that unsubstantiated symptoms amount to an incapacitating disability." *See Roberts*, 531 S.W.3d at 230. Her evidence is probative to establish that a disability exists and that disability prevents her from obtaining employment. *See id.*; *Pickens*, 62 S.W.3d at 216. We hold that the trial court did not abuse its discretion in concluding that Sherry "is unable to earn sufficient income to provide

55

for [her] minimum reasonable needs because of an incapacitating physical or mental disability." *See* TEX. FAM. CODE § 8.051(2)(A).

### 3. Minimum reasonable needs

Finally, Tom argues that the trial court's award of maintenance to Sherry is not appropriate because her monthly Social Security income and the assets that she received in the divorce decree—$613,584.62 and a Ford Mustang worth $10,500— are sufficient to provide for her minimum reasonable needs.

The trial court "cannot make a proper maintenance determination without considering the financial resources of each spouse upon dissolution of the marriage." *Roberts v. Roberts*, 402 S.W.3d 833, 841 (Tex. App.—San Antonio 2013, no pet.). The Family Code provides that the trial court may order maintenance "only if the spouse seeking maintenance will lack sufficient property, including the spouse's separate property, on dissolution of the marriage to provide for the spouse's minimum reasonable needs." TEX. FAM. CODE § 8.051(a). The Family Code does not define "minimum reasonable needs." *Slicker v. Slicker*, 464 S.W.3d 850, 860 (Tex. App.—Dallas 2015, no pet.). Determining the "minimum reasonable needs" for a particular individual is a fact-specific determination that should be made on a case-by-case basis. *In re Marriage of McCoy*, 567 S.W.3d 426, 429 (Tex. App.— Texarkana 2018, no pet.); *Amos*, 79 S.W.3d at 749.

Here, as stated above, we are remanding the case to the trial court to conduct a new just and right division of the parties' marital estate, a determination that will affect the parties' relative financial resources. *See Roberts*, 402 S.W.3d at 841. We therefore reverse the award of spousal maintenance to Sherry and instruct the trial court to consider, after dividing the parties' marital estate on remand, whether Sherry will lack sufficient property, including her separate property, on dissolution of the marriage to provide for her minimum reasonable needs, such that an award of spousal maintenance is appropriate. *See* TEX. FAM. CODE § 8.051(a); *Fuentes*, 555 S.W.3d at 171 (reversing award of spousal maintenance "for the trial court to determine the issue on remand in light of the new property division"); *Roberts*, 402 S.W.3d at 841 (reversing portion of decree awarding spousal maintenance because court was remanding for just and right division of marital estate); *see also K.T. v. M.T.*, No. 02-14-00044-CV, 2015 WL 4910097, at *15 (Tex. App.—Fort Worth Aug. 13, 2015, no pet.) (mem. op.) ("Because the comparative resources of the spouses, including the division of the community estate, are to be considered in the award of spousal maintenance, because we must remand for a new property division, and because the trial court's findings vis-à-vis spousal maintenance and child support are inconsistent, we conclude and hold that the trial court's order should be reversed as to the spousal maintenance and child support as well so that the trial court can consider all of these issues together.").

## Attorney's Fees

Finally, Tom argues that there is legally insufficient evidence that Sherry's attorney's fees were reasonable and necessary.

In a divorce proceeding, the trial court may award reasonable attorney's fees and expenses. TEX. FAM. CODE § 6.708(c); *Fuentes*, 555 S.W.3d at 172. The reasonableness of the fees is a fact question and must be supported by the evidence. *Fuentes*, 555 S.W.3d at 172. "To support an award of attorney's fees, evidence should be presented on the 'hours spent on the case, the nature of preparation, complexity of the case, experience of the attorney, and the prevailing hourly rates' in the community." *Id.* (quoting *Hardin v. Hardin*, 161 S.W.3d 14, 24 (Tex. App.—Houston [14th Dist.] 2004, judgm't vacated w.r.m.)).

A judgment awarding attorney's fees may be supported solely by the attorney's testimony. *Ayala v. Ayala*, 387 S.W.3d 721, 733 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Hardin*, 161 S.W.3d at 24 ("Sworn testimony from an attorney concerning an award of attorney's fees is considered expert testimony."). The factfinder should consider the typical *Arthur Andersen* factors in assessing reasonableness, as well as "the entire record, the evidence presented on reasonableness, the amount in controversy, the common knowledge of the participants as lawyers and judges, and the relative success of the parties." *Messier v. Messier*, 458 S.W.3d 155, 166–67 (Tex. App.—Houston [14th Dist.] 2015, no

pet.); *see Arthur Andersen & Co. v. Perry Equip Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) (listing eight factors that factfinders should consider when determining reasonableness of attorney's fees). We will reverse a determination of the reasonableness of attorney's fees based on a legal sufficiency challenge only if there is no evidence to support the fee award. *Messier*, 458 S.W.3d at 166.

Prior to the enactment of Family Code section 6.708(c) in 2013, parties had no statutory right to attorney's fees in a divorce action that did not involve a child custody determination. *See Barry v. Barry*, 193 S.W.3d 72, 75–76 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *see also* Act of May 24, 2013, 83rd Leg., R.S., ch. 916, § 4, 2013 Tex. Gen. Laws 2282, 2283 (amending Family Code section 6.708 to add subsection (c)). The trial court could, however, apportion attorney's fees as part of the just and right division of the marital estate. *Barry*, 193 S.W.3d at 76; *Sandone v. Miller-Sandone*, 116 S.W.3d 204, 208 (Tex. App.—El Paso 2003, no pet.). The trial in this case occurred in 2019, but the final divorce decree specifically stated as follows when it ordered Tom to pay Sherry's outstanding attorney's fees:

> The Court finds that under the circumstances that have been presented, and by [Tom's] conduct during this case, that the attorney's fees [incurred by Sherry] are reasonable, fair, and necessary, and that [Sherry's] attorney's fees and costs be assessed against [Tom] to effect an equitable division of the marital estate of the parties.

Thus, although the trial court had statutory authority to assess attorney's fees against Tom, the court also ordered Tom to pay Sherry's attorney's fees as part of the just and right division of the parties' marital estate.

Because we hold that the trial court committed reversible error with respect to characterizing portions of Tom's separate property as community property, an error which requires remand of the case to redivide the parties' marital estate, we vacate the award of attorney's fees to Sherry, which the trial court awarded "to effect an equitable division" of the parties' estate. *See Barry*, 193 S.W.3d at 76 (reversing award of attorney's fees in part because wife presented insufficient evidence supporting fee award but also because court determined that remand was appropriate to redivide marital estate); *Sandone*, 116 S.W.3d at 208 (same); *see also Rodgers v. Perez*, No. 03-16-00313-CV, 2017 WL 4348170, at *3 (Tex. App.—Austin Sept. 27, 2017, no pet.) (mem. op.) (remanding property division for reconsideration and stating "[t]his includes the district court's award of attorney's fees because the district court expressly made the award as part of its division of the community estate"). In conducting its division of the parties' marital estate on remand, the trial court should consider whether ordering Tom to pay Sherry's attorney's fees is still appropriate. *See Henry*, 48 S.W.3d at 481 ("[T]o the extent the [attorney's] fees were awarded as part of the division of the property, the trial court should reexamine the award on remand as a part of making a just and right division of the property.").

## Conclusion

We affirm the portion of the divorce decree that dissolves the marriage of the parties. We reverse the portion of the divorce decree that divides the parties' property and orders Tom to pay Sherry's attorney's fees, and we remand the case to the trial court to exercise its discretion to divide the marital estate of the parties in accordance with this opinion. We also reverse the portion of the divorce decree that awards spousal maintenance to Sherry and remand that portion of the decree to the trial court for reconsideration in light of the new property division.

April L. Farris
Justice

Panel consists of Justices Kelly, Guerra, and Farris.